Patricia E. GENTALA; Robert A.
Gentala, Plaintiffs–Appellants–
Cross–Appellees,

v.

CITY OF TUCSON, Defendant–
Appellee–Cross–Appellant.

Nos. 97–17062, 97–17069.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1999

Filed April 20, 2000

Kevin H. Theriot, American Center for Law and Justice, Lawrenceville, Georgia, for the plaintiffs-appellants-cross-appellees.

Thomas J. Berning, City Attorney, Tuscon, Arizona, for the defendant–appellee–cross–appellant.

Before: SNEED and PREGERSON, Circuit Judges; CARTER,[1] District Judge.

Opinion by Judge CARTER; Dissent by Judge PREGERSON.

CARTER, District Judge:

These appeals require us to navigate carefully the shoal-infested channel between the Scylla of the First Amendment's Free Speech Clause and the Charybdis of the First Amendment's Establishment Clause. In attempting this task, we are fully cognizant of Justice O'Connor's observation when engaged in a similar judicial endeavor: "Reliance on categorical platitudes is unavailing. Resolution instead depends on the hard task of judging. . . . Such judgment requires courts to draw lines, sometimes quite fine, based on the particular facts of each case." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 847, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (O'Connor, J., concurring).

## FACTUAL BACKGROUND

This case arises from the City of Tucson's rejection of Patricia and Robert Gentalas' application to the City's Civic Events Fund for the coverage of costs for city services for local observances of the National Day of Prayer held in one of the City's public parks.[2]

The City established the Fund to encourage civic events and provide a budgetary mechanism for accounting for the costs of in-kind services provided by the City for certain civic events. The Fund provides support for events "that celebrate and commemorate the historical, cultural and ethnic heritage of the City and the nation, or increase the community's knowledge and understanding of critical issues, with the purpose of improving citizens' quality of life; generate broad community appeal and participation . . .; [or] instill civic pride in the City, state or nation." In-kind services provided by the City include use of the parks' event equipment, refuse containers and street sweeping.

As the organizers of the local observance of the National Day of Prayer, the Gentalas applied to the Fund for coverage of the costs of city services. The event organized by the Gentalas was part of the annual observance of the National Day of Prayer. *See Lynch v. Donnelly*, 465 U.S. 668, 677, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). This event was established by a

---

1. The Honorable David O. Carter, District Judge for the Central District of California, sitting by designation.

2. According to the Gentalas' application to the Fund, the services for which they sought coverage amounted to less than $500.

joint resolution of Congress in 1952. Since 1952, each President has marked the Day with a presidential proclamation. For the year in question, President Clinton and the City's mayor issued a proclamation concerning the event. The Mayor's proclamation "clearly state[d] how prayer and especially the observance of a national day of prayer is part of the historical and cultural heritage of" the City and the nation. United States Air Force personnel, pastors from nine of the City's congregations, and almost one hundred people attended the event. The Gentalas' application stated that the participants would be led in prayer for various concerns: improved relationships between different segments of society; political leaders; law enforcement and emergency services personnel; youth, families, neighborhoods and the homeless; educators and schools. The application also stated that the event would include patriotic decorations and music. Thus, while the event had a strong sectarian character, as a civic event capable of increasing the community's knowledge and understanding of critical issues as well as generating broad community interest, support and civic pride, the event fell within the scope of events for which the Fund had been created.

Prior to holding their event, the Gentalas submitted an application for reimbursement of costs from the Fund to the subcommittee which administers the Fund. After the event had been mounted, the City Council reviewed the subcommittee's rejection and upheld it. Both groups cited only the Fund's explicit policy statement that "events held in direct support of religious organizations" are not eligible for the provision of services and concerns about how the Constitution regulates church-state relations in support of the rejection of the Gentalas' application.

The Gentalas subsequently filed this action alleging that on its face and as applied to their application the Fund's exception for "events held in direct support of religious organizations" violated the Free Speech, Free Exercise and Establishment Clauses of the First Amendment.[3] The Gentalas sought to enjoin the City from excluding plaintiffs and other religious groups from eligibility for coverage of costs under the Fund. The district court denied the Gentalas' motions for preliminary and permanent injunctive relief, concluding that the City's actions did not violate the Gentalas' free speech rights and that funding the National Day of Prayer activities would have violated the Establishment Clause.

During the proceedings, the City moved to amend their answer to add state-law defenses. The district court denied the City's motion to amend their answer.

Both the Gentalas and the City have filed appeals challenging the district court's respective adverse rulings.

## STANDARDS OF REVIEW

 We review for abuse of discretion the district court's denial of preliminary and permanent injunctive relief. *See Roe v. Anderson*, 134 F.3d 1400, 1402 & n. 1 (9th Cir.1998), *aff'd, Saenz v. Roe*, 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1493 (9th Cir. 1996). The district court abuses its discretion when it bases its decision on erroneous legal or factual conclusions. *See Roe*, 134 F.3d at 1402 n. 1; *Easyriders*, 92 F.3d at 1493.

[T]o obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable

---

**3.** Because we conclude that the City violated the Gentalas' free-speech rights and that the Establishment Clause does not provide a sufficiently compelling reason to justify that viola-

tion in the context of this case, we do not address the Gentalas' other constitutional claims.

harm increases as the possibility of success decreases.

*Roe,* 134 F.3d at 1402. To obtain a permanent injunction, the moving party must demonstrate "the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." *Easyriders,* 92 F.3d at 1495 (internal quotation and citation omitted). " 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1148 (9th Cir.) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)), *amended by* 160 F.3d 541 (9th Cir.1998).

■ We also review for abuse of discretion the district court's denial of leave to amend. *See Bonin v. Calderon,* 59 F.3d 815, 845 (9th Cir.1995). Although there are strong public policy justifications urging liberality in granting leave to amend, "[f]utility of amendment can, by itself, justify the denial of a motion for leave to amend." *Id.*

## ANALYSIS

### The Gentalas' Appeal

The Gentalas contend that the City's rejection of their application for coverage of the cost of city services under the Civic Events Fund violated their free-speech rights guaranteed by the First Amendment. In response, the City argues both that there was not a free-speech violation and that even if the Gentalas' free-speech rights were infringed, this was justified by the City's compelling interest in avoiding an Establishment Clause violation.

### Free Speech/Public Forum Issue

■ The Supreme Court's decision in *Rosenberger* guides our resolution of the free-speech issues in this case. In *Rosenberger,* the Court reiterated that the principal evil from the government against which the Free Speech Clause protects the citizenry is discrimination on the basis of viewpoint when regulating expressive activities. *See Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510 (citing *R.A.V. v. City of St. Paul,* 505 U.S. 377, 391, 112 S.Ct. 2538, 120

L.Ed.2d 305 (1992)); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). This prohibition on viewpoint discrimination retains its vitality even when government has created the forum in which expressive activities occur. *See id.; see also DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,* 196 F.3d 958, 969 (9th Cir.1999).

■ As an initial matter, we must determine whether the National Day of Prayer event amounted to expressive conduct protected by the First Amendment's Free Speech Clause. According to the Gentalas' application, they were inviting people to gather in the park for a time of praise and worship with singing and prayer. Such activity is speech within the meaning of the First Amendment. *See Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995); *Widmar v. Vincent,* 454 U.S. 263, 265 n. 2, 269, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

Having concluded that the Gentalas were engaging in speech within the meaning of the First Amendment, we must next determine the nature of the forum to which they sought access. *See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *DiLoreto,* 196 F.3d at 964. Before determining the forum's character, however, we must clearly define the forum in question.

■ "The relevant forum is defined by the access sought by the speaker." *See DiLoreto,* 196 F.3d at 965 (citing *Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439). The parties and the district court have discussed the issues raised by this case as if both the City's parks and the City's Civic Events Fund were relevant fora. The City is correct in its assertion that the Gentalas were never denied access to the public park. They were allowed to hold their event. After having held their event, however, the Gentalas appealed the subcommittee's rejection of their application

for cost-coverage of city services under the Fund to the full City Council. Given this post-event activity, we conclude that the Gentalas sought access to the Fund, not merely to the park. Although the Fund is not a forum for speech in the physical sense, as a government-created source of funding to cover costs associated with engaging in behavior deserving First Amendment protection, the Fund is a forum within the meaning of the First Amendment. *See Rosenberger*, 515 U.S. at 830, 115 S.Ct. 2510 (stating that a fund created by the University of Virginia to cover the printing costs of student organizations' publications was "a forum more in a metaphysical than in a spatial or geographical sense, but the same [First Amendment] principles are applicable").

 " 'Forum analysis divides government property into three categories: public fora, designated public fora, and nonpublic fora.' " *DiLoreto*, 196 F.3d at 964 (quoting *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 976 (9th Cir.1998), *cert. denied*, 526 U.S. 1131, 119 S.Ct. 1804, 143 L.Ed.2d 1008 (1999)); *see also Perry Educ. Ass'n*, 460 U.S. at 45–46,

103 S.Ct. 948. Because the Fund is not a source of funding for expressive activities held in trust since time immemorial, we conclude that it is not a traditional public forum. *See Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. 948. Because the Fund's implementing policy states on its face that the Fund is limited to certain topics and certain speakers and because the record developed by the parties demonstrates that the Fund has been managed in a selective manner, we cannot conclude that the City has designated the Fund as a forum open to general expressive activity. *See Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 391–92, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439; *DiLoreto*, 196 F.3d at 965. Following the Supreme Court's lead in *Rosenberger*, we conclude that the Fund is a limited public forum that has been opened to support the expressive activities of certain groups speaking about certain topics. *See Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510; *see also DiLoreto*, 196 F.3d at 965, 967.[4]

 The dissent argues, relying on *National Endowment for the Arts v. Fin-*

---

4. As the dissent correctly notes, the terms "designated public forum," "limited public forum," and "nonpublic forum" have not always been used with precision. *See DiLoreto*, 196 F.3d at 965 & n. 4. A "designated public forum" is a forum which the government, through its explicit and intentional conduct, has designated as a forum generally open to the public for expressive activity. *See Perry Educ. Ass'n*, 460 U.S. at 46–47, 103 S.Ct. 948; *Widmar*, 454 U.S. at 267–68 & n. 5, 270, 102 S.Ct. 269; *DiLoreto*, 196 F.3d at 965 & n. 4. The Supreme Court has referred to a forum opened by the government to certain speakers or topics as a "limited public forum," *see Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510; the Ninth Circuit has referred to such a forum as a "nonpublic forum open for a limited purpose," *see DiLoreto*, 196 F.3d at 965–66. Because content-based discrimination is not allowed absent a compelling interest in either a traditional or designated public forum, *see Perry Educ. Ass'n*, 460 U.S. at 54–55, 103 S.Ct. 948, and is permissible in fora opened for more limited purposes to preserve the nature of the forum, *see Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510; *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. 948; *DiLoreto*, 196 F.3d

at 965–66, the Ninth Circuit's terminology may lead to less conceptual blurriness. Regardless of the terminology used to describe the forum, however, the Supreme Court and the Ninth Circuit agree that governmental discretion in managing the more selective forum is bounded by the same considerations—reasonableness in light of the forum's purpose and viewpoint neutrality. *See Rosenberger*, 515 U.S. at 829–30, 115 S.Ct. 2510; *Perry Educ. Ass'n*, 460 U.S. at 48–49, 103 S.Ct. 948; *DiLoreto*, 196 F.3d at 967, 969. Thus, because the distinction between a limited public forum and a nonpublic forum is a semantic distinction without an analytic difference, and because the *Rosenberger* Court referred to the fund it was analyzing as a limited public forum, a fund we conclude is most analogous to the Fund at issue in this case, we will continue to use that terminology. *See Finley*, 118 S.Ct. at 2178 (stating the fund at issue in *Rosenberger* was a "limited public forum"); *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 (stating the fund being analyzed by the Court was a "limited public forum"); *DiLoreto*, 196 F.3d at 965 (noting that the *Rosenberger* Court had used the term "limited public forum").

*ley,* 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998), that because the City makes selective determinations when awarding reimbursements under the Fund that the Fund is exempt from forum analysis. The dissent's reliance on *Finley* is misplaced. The policy being challenged in *Finley* was of a different character than the policy being challenged in this case. As the Supreme Court was careful to point out, the "decency" criterion in *Finley* was one of several criteria for the NEA to consider when making funding decisions, *see id.* at 2175–76, whereas the City's Fund renders any "event held in direct support of religious organizations" absolutely ineligible for reimbursement of costs. Moreover, the nature of the challenges to the respective policies in *Finley* and this case are of a notably different character. In *Finley,* the Supreme Court was considering a facial challenge to the NEA's "decency" criterion. *See id.* at 2175, 2178. This is relevant for at least two reasons. First, the burden on litigants pursuing a facial challenge is much heavier than the burden on litigants pursuing an as-applied challenge. *See id.* at 2175. Second, even a policy which is viewpoint-neutral on its face may be applied in a viewpoint-discriminatory manner. The Court in *Finley* explicitly pointed out that they were not considering "a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination" because the litigants had brought a facial challenge. *See id.* at 2178. In this case, however, we are considering an actual denial by the City and we know

the motivation behind the City's decision. Even if we agreed with the dissent's analysis that the City could have denied the Gentalas' application for a number of reasons under the Fund's implementing policy, in actuality, the record shows—and the City has never contested—that the application was denied due to the religious character of the event for which the Gentalas were seeking reimbursement. These factors—the absolute bar for reimbursement of certain kinds of events in the City's policy, the character of the Gentalas' challenge, and the state of the record— make this appeal more like *Rosenberger* than like *Finley.*

■ In maintaining the boundaries and integrity of the Fund, the City will, of necessity, engage in discrimination on the basis of the content of applicants' speech. In managing this forum, however, the City's decisions to exclude speakers must be reasonable in light of the Fund's purposes. *See Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510; *DiLoreto,* 196 F.3d at 965, 967. Thus, content-based discrimination is legitimate only if conducted consistent with the Fund's purposes, whereas any discrimination between applicants on the basis of viewpoint is forbidden. *See Board of Regents of the Univ. of Wis. Sys. v. Southworth,* — U.S. —, 120 S.Ct. 1346, 1356–57, 146 L.Ed.2d 193 (2000); *Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510; *DiLoreto,* 196 F.3d at 965, 967.[5]

The Fund's implementing policy states that the Fund has been created, in part, to

---

5. Although the Supreme Court's decision in *Widmar* is instructive in our analysis of the issues on appeal, the distinction between discrimination permissible in traditional and designated public fora on the one hand and in limited and nonpublic fora on the other prevents *Widmar* from controlling the present case. The Supreme Court classified the meeting space in *Widmar* as a designated public forum. *See Widmar,* 454 U.S. at 267–68 & n. 5, 270, 102 S.Ct. 269. The Court then concluded that prohibiting groups from using classrooms as meeting space "based on the religious content of the group's intended speech" was content-based discrimination

that could only be justified by a compelling interest and a narrowly tailored regulation. *Id.* at 270, 102 S.Ct. 269. If the Fund were a traditional or designated public forum, the exception for religious speech would be an impermissible content-based discrimination. *See id.* at 276, 102 S.Ct. 269. Because the Fund is, at most, a limited public forum opened for certain speakers and topics, *Widmar* is inapplicable to the free-speech analysis and we must determine whether the exception discriminates on the basis of viewpoint on its face or as applied to the Gentalas by the City.

"encourage and support [c]ivic [e]vents that: celebrate and commemorate historical, cultural and ethnic heritage of the City and the nation, or increase the community's knowledge and understanding of critical issues, with the purpose of improving citizens' quality of life; generate broad community appeal and participation; [or] instill civic pride in the City, state, or nation." While the Gentalas' event obviously had sectarian elements, as previously described, it also had a civic character and fits comfortably within the general subject matter of events for which the Fund was created.[6]

The policy explicitly excludes those "events held in direct support of religious organizations" and the City relied upon this exemption when rejecting the Gentalas' application. The Gentalas' application indicates that a free-will offering was to be taken at the end of the event. Although such an offering would probably be small in relation to the cost of mounting the event,[7] the offering might provide some degree of financial support for the organizers of the event. The requested reimbursement from the City's Fund, some $340 in costs, is also a meager financial outlay. The record establishes that the National Day of Prayer was publicized and organized in a manner consistent with the Judeo–Christian tradition and counsel for the Gentalas stated at oral argument that the National Day of Prayer event was presented from a Christian perspective. Thus, the event had a clear religious perspective and we must acknowledge that a public prayer service conducted from such a perspective would support members of Jewish and Christian religious organizations more than members of other faith

traditions or members of the public-at-large who belong to a non-religious tradition. We cannot conclude, however, that the minimal and diffuse benefits from this event amount to a constitutionally impermissible support of religion.

█ Although we have concluded that reimbursement of the event's costs under the Fund was not direct support of religion in a constitutional sense, we cannot conclude that the City acted in bad faith when deciding that the National Day of Prayer event fell within the Fund's exception. See Cornelius, 473 U.S. at 808, 105 S.Ct. 3439 ("The Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation."). Even if the exclusion was reasonable, however, the City could not reject the Gentalas' application based on their viewpoint as speakers. See Rosenberger, 515 U.S. at 830, 115 S.Ct. 2510; DiLoreto, 196 F.3d at 969. In other words, the Gentalas' application could not be denied merely because it would bring a religious perspective to an otherwise permissible conversation. See Rosenberger, 515 U.S. at 831, 115 S.Ct. 2510; Lamb's Chapel, 508 U.S. at 393–94, 113 S.Ct. 2141.

As noted previously, the Supreme Court in Rosenberger examined a fund established by the University of Virginia to cover the printing costs for publications from approved student groups. See Rosenberger, 515 U.S. at 824, 115 S.Ct. 2510. The University excluded from its scheme those publications written by groups engaging in "religious activities." Id. at 825, 115 S.Ct. 2510. Wide Awake Productions, a student group which published a maga-

---

6. For this reason, the dissent's reliance on *DiLoreto* is misplaced. In *DiLoreto,* this Court upheld the School District's refusal to post the text of the Ten Commandments on Downey High School's baseball field fence. *See DiLoreto,* 196 F.3d at 962. The Court concluded that the refusal was permissible content-based discrimination, not because of the religious character of the posting *per se,* but because the forum itself had been limited to business advertising. *See id.* at 969. ("Mr.

DiLoreto's ad was not a statement addressing otherwise-permissible subjects from a religious perspective....") Because the Gentalas' event fit the religiously neutral criteria for inclusion within the forum created by the City's Fund, this case is distinguishable from *DiLoreto.*

7. The prior year, the free-will offering raised $393.84 and the expenses associated with the event amounted to $404.54.

zine "offer[ing] a Christian perspective on both personal and community issues," was denied coverage under the policy. *Id.* at 825–27, 115 S.Ct. 2510. The Supreme Court concluded that the University's denial of coverage was an unconstitutional form of viewpoint discrimination. *See id.* at 831, 115 S.Ct. 2510; *see also Southworth*, 120 S.Ct. at 1356–57. In reaching this conclusion, the Supreme Court relied heavily on *Lamb's Chapel. See Rosenberger*, 515 U.S. at 830–32, 115 S.Ct. 2510. In *Lamb's Chapel*, a local school board permitted community groups to use its buildings after hours, but denied access to a group wanting to show a film series "that ... would discuss ... the undermining influences of the media that could only be counterbalanced by returning to traditional, Christian family values." *Lamb's Chapel*, 508 U.S. at 386–88, 113 S.Ct. 2141.

■ The National Day of Prayer event was, in part, a civic gathering drawing the community together to address issues of community-wide concern—e.g., homelessness, education, law enforcement. The nature of the event fits within the general purposes of the forum. Moreover, there is no indication from the record that if a local public school wanted to hold a fund-raiser or if a group of social service providers wanted to hold a rally on behalf of homeless people that the City would have denied their applications to the Fund.[8] The Gentalas' application was rejected because of their view that the most relevant manner in which to address these important social concerns was through the expressive acts of worship, singing and prayer. "Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered. The prohibited

perspective ... resulted in the refusal" to provide access to the relevant forum. *Rosenberger*, 515 U.S. at 831, 115 S.Ct. 2510.

The record also indicates that the City had approved an application to the Fund by the Tucson Festival Society and Carrillo School for a Las Posadas festival. The festival is a re-enactment of a story from Christian folklore—namely, Joseph and Mary's search for lodging in Bethlehem prior to the birth of Jesus. The City approved funding for this "religious-related" event because it was "art" and was "not held to directly support a religious organization." Because the Las Posadas festival re-enacts an event connected with the Christian tradition, it would provide the same kind of diffuse support for Christianity writ large as would the National Day of Prayer event. Thus, the City decided that artistic expression was a sufficiently indirect way of engaging a religious tradition—and therefore an appropriate activity in the forum, but that public prayer was too direct a way of engaging a religious tradition—and therefore an inappropriate activity in the forum.

■ Although we can sympathize with the difficult judgment calls the City is required to make when reviewing applications to the Fund, we conclude that its rejection of the Gentalas' application was impermissible viewpoint discrimination in violation of the Free Speech Clause of the First Amendment. *See Rosenberger*, 515 U.S. at 829–831, 115 S.Ct. 2510; *Lamb's Chapel*, 508 U.S. at 392–94, 113 S.Ct. 2141. Moreover, in light of our discussion of the Las Posadas application, we conclude that distinguishing between those who speak about religion who are directly supporting a religious organization and those who speak about religion who are not will al-

---

**8.** Although both the *Rosenberger* and *Lamb's Chapel* Courts concluded that the government had engaged in viewpoint discrimination, in neither opinion was there any discussion of other speakers being allowed access to the forum to discuss the same issues from a non-religious perspective. In *Lamb's Chapel*, the Court was satisfied that the school board had

engaged in viewpoint discrimination where the record was silent on the question of whether the subject matter seeking to be addressed by the religious speaker was forbidden, but the record clearly established that the film series was rejected because of its religious perspective. *See Lamb's Chapel*, 508 U.S. at 393–94, 113 S.Ct. 2141.

ways require the City to discriminate on the basis of the speakers' viewpoint. *See Board of Educ. of Westside Community Schs. v. Mergens,* 496 U.S. 226, 248, 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990); *Widmar,* 454 U.S. at 272 n. 11, 102 S.Ct. 269.

### Establishment Clause Issue

 The City contends that its rejection of the Gentalas' application was justified in light of the City's compelling interest in obeying the strictures of the First Amendment's Establishment Clause.[9] Following the Supreme Court's lead in *Rosenberger,* we reject the City's argument and conclude that reimbursing costs for the Gentalas' event under the Fund would not have violated the Establishment Clause. *See Rosenberger,* 515 U.S. at 839, 115 S.Ct. 2510.

 A majority of the Justices of the Supreme Court have never agreed as to the precise meaning and relevance of the history of the Establishment Clause. The Court has agreed, however, that the Establishment Clause

> means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

9. Obeying the mandate of the Establishment Clause is undeniably a compelling state interest. *See Capitol Square,* 515 U.S. at 761–62,

*Everson v. Board of Educ. of Ewing Tp.,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947). At the same time, the Supreme Court has repeatedly stated that government may acknowledge the role of religion in the life of its citizenry and incorporate some religious expression into public life. *See Lynch,* 465 U.S. at 674–78, 104 S.Ct. 1355; *Marsh v. Chambers,* 463 U.S. 783, 792, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). The "central lesson" of the Supreme Court's Establishment Clause jurisprudence "is that ... governmental programs" must maintain "neutrality towards religion." *Rosenberger,* 515 U.S. at 839, 115 S.Ct. 2510. On a number of occasions, the Court has concluded that governmental programs which distribute benefits on religiously neutral grounds do not run afoul of the Establishment Clause merely because they provide incidental benefits to organizations that seek to engage in religious expression. *See id.; Capitol Square,* 515 U.S. at 762–63, 115 S.Ct. 2440; *Widmar,* 454 U.S. at 273–74, 102 S.Ct. 269.

 When determining whether the relationship between religious expression and the government is permissible under or violative of the Establishment Clause, "it [is] useful to inquire whether the challenged law or conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion." *Lynch,* 465 U.S. at 679, 104 S.Ct. 1355 (citing *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). At the same time, we are not bound "to any single test or criterion in this sensitive area." *Id.*

The City's Fund, which exists to support and encourage events celebrating the history and culture of the City's residents, undeniably serves a secular interest. *See Lamb's Chapel,* 508 U.S. at 395, 113 S.Ct. 2141; *Widmar,* 454 U.S. at 271, 102 S.Ct.

115 S.Ct. 2440; *Lamb's Chapel,* 508 U.S. at 394, 113 S.Ct. 2141.

269. Insofar as the City seeks to avoid entanglement with religion when administering the Fund, its best opportunity for doing so is to abandon attempts to distinguish between religious expression that directly supports a religious organization and religious expression that indirectly supports religion. *See Widmar*, 454 U.S. at 272 n. 11, 102 S.Ct. 269.

The City's Fund also does not have the primary or principal effect of advancing religion. The Supreme Court has concluded that a state university's provision of a classroom to a student Bible study club for its meetings constituted only negligible aid for such devotional exercise and thus was not constitutionally impermissible. *See Widmar*, 454 U.S. at 273, 102 S.Ct. 269. In *Lynch*, Chief Justice Burger, writing for the majority, concluded that a nativity scene, while religiously significant by itself, when placed by the city government among secular symbols such as "candy-striped poles ...", carolers, [and] cutout figures representing such characters as a clown, an elephant, and a teddy bear" in the business district of the City of Pawtucket, Rhode Island, did not substantially support any religion in a constitutionally problematic manner. *Lynch*, 465 U.S. at 671, 687, 104 S.Ct. 1355.

> The dissent asserts some observers may perceive that the City has aligned itself with the Christian faith by including a Christian symbol in its display and that this serves to advance religion. We can assume, arguendo, that the display advances religion in a sense; but our precedents plainly contemplate that on occasion some advancement of religion will result from governmental action. The Court has made it abundantly clear, however, that "not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon [religion] is, for that reason alone, constitutionally invalid." *Committee for Public Educ. and Religious Liberty v. Nyquist*, 413 U.S. 756, 771, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

*Id.* at 683, 104 S.Ct. 1355. Similarly, here, even if the City's reimbursement of costs for the National Day of Prayer event pro-vided some support for theism over its opposite, or for Christianity over competing world views, the support provided by the City was neither substantial nor direct enough to amount to advancement of religion under the Supreme Court's Establishment Clause jurisprudence.

In more recent cases involving private religious speech in government-created fora, the Supreme Court has focused on whether the religious expression occurring in the forum has been endorsed or favored by the government when determining whether there is an Establishment Clause violation. *See Capitol Square*, 515 U.S. at 762–65, 115 S.Ct. 2440; *Rosenberger*, 515 U.S. at 839–40, 115 S.Ct. 2510; *Lamb's Chapel*, 508 U.S. at 393, 113 S.Ct. 2141. In *Rosenberger*, the most legally and factually analogous case to the one before us, the Court reviewed the constitutionality of the University of Virginia's refusal to cover the printing costs of a student publication, based on the publication's religious perspective, due to the University's concern that covering the costs would violate the Establishment Clause. *See Rosenberger*, 515 U.S. at 822–23, 115 S.Ct. 2510. The Court concluded that the University would not violate the Establishment Clause by covering the publication's printing costs when using "neutral criteria and evenhanded policies" to determine which applicants would have their costs covered. *See id.* at 839, 845–46, 115 S.Ct. 2510.

■ The first distinction between *Rosenberger* and the present case urged by the City is that the publication in *Rosenberger* was not produced by a "religious organization," *see id.* at 826 & 844, 115 S.Ct. 2510, and that the event for which the Gentalas sought in-kind services was. Assuming that the City is correct that the organization responsible for managing the National Day of Prayer is a religious organization, we conclude that this factual difference is an insufficient basis for distinguishing *Rosenberger*. In *Widmar*, the Supreme Court reviewed the University of Missouri at Kansas City's decision to for-

bid "an organization of evangelical Christian students from various denominational backgrounds" from meeting in "facilities generally available for activities of registered student groups." *Widmar*, 454 U.S. at 264–65 & n. 2, 102 S.Ct. 269 (1981). The Supreme Court dismissed the University's concerns about an Establishment Clause violation for its provision of meeting space for the student group acknowledging that it was "possible—perhaps even foreseeable—that religious groups will benefit from access to University facilities." *Id.* at 273, 102 S.Ct. 269. *Widmar* demonstrates that the mere provision of services or conferral of benefits to a religious organization under an otherwise neutral policy does not, without more, violate the Establishment Clause. *See Rosenberger*, 515 U.S. at 839, 115 S.Ct. 2510; *Widmar*, 454 U.S. at 273–74, 102 S.Ct. 269. Moreover, the *Rosenberger* Court itself stated that even if the organization seeking coverage of printing costs from the University of Virginia was a "church," there would be no Establishment Clause violation because the scheme at issue was not making "*direct* money payments to an institution or group that is engaged in religious activity." *Rosenberger*, 515 U.S. at 842, 115 S.Ct. 2510 (emphasis added).

■ In a similar vein, the dissent relies on the Gentalas' original application for reimbursement from the Fund, and attachments thereto, which state that the National Day of Prayer event was being organized for "Tucson Christians." The district court stated that the National Day of Prayer event was open to the public and nothing in the record or the comments by the City Council which reviewed the Gentalas' application after the event had been held indicates that the event excluded non-Christians from the event. The fact that a government-subsidized event which remains open to the public is organized for and by a particular religious group is insufficient to create an Establishment Clause violation. *See Widmar*, 454 U.S. at 265 n. 2, 102 S.Ct. 269 (noting that a Christian group's meetings were "open to the public"). Finally, the dissent notes

that all the speakers at the event were Christians to support the charge of an Establishment Clause violation. In *Rosenberger*, however, the publication which the University of Virginia refused to subsidize—a decision the Supreme Court rebuked—was a magazine with an explicit and obvious Christian perspective on the issues discussed. *See Rosenberger*, 515 U.S. at 825–26, 115 S.Ct. 2510.

■ In *Widmar* and *Rosenberger*, the Supreme Court was much less concerned about the religious identity or message of the speakers being subsidized by the state than it was about the nature of subsidy being offered. The Court's concern in these cases is whether the support offered by the state is part of a neutral program available to a large range of speakers or whether it is a program designed and administered to further religious interests in some direct way. The City and the dissent would have us read the Establishment Clause in a way that forbids religious groups and religious speakers from participating in and taking advantage of neutral government programs available to citizens motivated by non-sectarian concerns. Such a theory of the Establishment Clause implicitly denigrates those citizens who seek to operate in the public realm and engage the larger culture in light of their religious convictions and fails to take seriously the constitutional values enshrined in the Free Speech and Free Exercise Clauses.

■ The *Rosenberger* Court focused extensively on whether the payments from the University of Virginia's fund were being made directly to the student organization. *See id.* at 842–43, 115 S.Ct. 2510. We agree with the City and the district court that the *Rosenberger* Court was careful to explain that its conclusion might have been different if the scheme under review had involved "a tax levied for the direct support of a church," *id.* at 840, 115 S.Ct. 2510, if the money available could be used for "unlimited purposes," *id.* at 841, 115 S.Ct. 2510, or if the program made

"direct money payments to ... a group that is engaged in religious activity," *id.* at 842, 115 S.Ct. 2510. The City's own evidence, however, demonstrates that the Fund is not the kind of policy about which the *Rosenberger* Court expressed suspicion. According to a management analyst from the City's Department of Budget and Research, money from the Fund is never paid directly to the event sponsors—event sponsors request services from the City; the relevant City departments submit billing statements to the Fund instead of the event sponsors; the costs of the services are charged against the Fund. As its implementing policy states, the Fund is "a budgetary means of detailing the costs City departments incur providing in-kind support to Civic Events." Moreover, the City maintains control over what services will be covered by the Fund and the amount the Fund will be charged for these services. Although the City's absorption of costs for in-kind services through the Fund clearly provides a benefit to the National Day of Prayer event, this is not a case where the City "is making direct money payments to an institution or group that is engaged in religious activity." *Id.* at 842–43, 115 S.Ct. 2510. Moreover, insofar as the in-kind services made available under the Fund were the provision of physical-plant facilities, the Supreme Court has concluded that such services are "'incidental' benefits" which can be provided to religious groups by the government without violating the Establishment Clause. *See Widmar*, 454 U.S. at 273, 102 S.Ct. 269.

The City also argues that this case is different from *Rosenberger* because the Fund is created through general revenue taxes and the printing-cost fund in *Rosenberger* was created through the assessment of student fees. The Supreme Court did state in *Rosenberger* that its decision "cannot be read as addressing an expenditure from a general tax fund." *Rosenberger*, 515 U.S. at 841, 115 S.Ct. 2510. While this is a close question, we conclude that the City presses this difference as a formal distinction whereas the Court used it as a functional one. Both student-fee and general-tax assessments are mandatory on the relevant population. *See id.* at 840, 115 S.Ct. 2510 (treating the student-fee as a mandatory assessment). Thus, it cannot be the mandatory character of a general tax that would give rise to different considerations under the Establishment Clause. A plurality of the Court distinguished between a student fee and a general tax based on the limited purposes for which the student fees could be used and the neutrality of the program under which student fees were distributed. *See id.* at 840–41, 115 S.Ct. 2510. Given that the Fund was used for a limited purpose, that the City maintains a great deal of discretionary control over the Fund, and that the Fund is not administered to favor religion, we conclude that the Fund is more like the student-fee generated fund in *Rosenberger* than a general-tax generated fund.[10]

10. In her concurrence, Justice O'Connor identifies two other reasons why a fund created by student fees should be analyzed differently than a fund created by general tax assessments. *See id.* at 851–52, 115 S.Ct. 2510. Justice O'Connor observes that the fund in *Rosenberger* "belongs to the students" because it is administered by them and is used to benefit those who paid into the fund. *See id.* Given that the Fund is administered by a City Council composed of duly-elected representatives of the residents of the City of Tucson to provide civic events for the benefit of the residents of the City of Tucson, we conclude that it belongs to the City in a similar fashion. Justice O'Connor also observes that students may have a First Amendment right to "opt-out" of student-fee assessments not available to citizens who have to pay tax assessments. *See id.* at 851, 115 S.Ct. 2510. This is a distinction between the Fund in *Rosenberger* and the City's Fund, but it is a distinguishing characteristic which only garnered one vote from the Court. Moreover, a majority of the Court has subsequently rejected such an argument with respect to viewpoint-neutral subsidy programs. *See Southworth*, 120 S.Ct. at 1349–50. Accordingly, we cannot find it a persuasive rationale for why this case should be resolved differently than the majority resolved *Rosenberger*.

The Supreme Court's concern about direct payments to religious organizations and their treatment of the student-fee/general-tax distinction provides a larger perspective on the underlying rationale of *Rosenberger*. The Court has acknowledged in *Widmar, Mergens,* and *Lamb's Chapel* that programs of the state which provide benefits to groups on a neutral basis may benefit religious groups or religious perspectives when the relevant group meets the criteria of the program. In *Rosenberger*, the Court once again articulated its view that the Establishment Clause is not violated when religious groups happen to benefit from programs which are, by all accounts, neutral as to religion. *See Rosenberger*, 515 U.S. at 839, 115 S.Ct. 2510. Only where the programs would provide in-kind or financial benefits which would allow the religious organization to pursue its sectarian goals in an unfettered way on the government's dole or in the government's forum is the Establishment Clause possibly violated. Where, as in *Rosenberger* and as with the Fund, the government does not make direct payments to the organization and maintains control over which activities will be subsidized, the government can ensure that only those activities by sectarian groups which have a sufficient secular import will receive government assistance. Allowing religious groups to participate as beneficiaries of otherwise neutral programs fosters the nation's commitment to freedom of expression and to religious liberty without raising the specter of a state-sanctioned or state-funded church, which was the historical inspiration of the Establishment Clause. *See Lynch*, 465 U.S. at 678, 104 S.Ct. 1355.

Finally, the *Rosenberger* Court noted that "[t]he University has taken pains to disassociate itself from the private speech involved in this case." *Rosenberger*, 515 U.S. at 841, 115 S.Ct. 2510. Whether private religious speech would be mistaken for the speech of the government is a central inquiry under the Establishment Clause. *See id.; Widmar*, 454 U.S. at 274, 102 S.Ct. 269. The City and the district court relied on the presence of City employees operating lighting and sound equipment to establish that the National Day of Prayer event could be mistakenly interpreted as the speech of the City. In light of *Widmar*'s teaching that allowing religious groups to meet on campus is insufficient to "confer any imprimatur of state approval," we conclude that the presence of City employees, without more, does not create such an imprimatur. *See Widmar*, 454 U.S. at 274 & n. 14, 102 S.Ct. 269; *see also Mergens*, 496 U.S. at 249–50, 253, 110 S.Ct. 2356.[11]

The record also demonstrates, however, that any event having costs covered by the Fund must "acknowledge through event advertising and an announcement during [the] event that the City has contributed services to the event." In *Capitol Square*, 515 U.S. at 763, 115 S.Ct. 2440, a plurality of the Court rejected the government's argument that a cross erected by a private group and placed in close "proximity to the seat of government" would violate the Establishment Clause because it "may produce the perception that the cross bears the [government's] approval." The plurality stated that government endorses religious expression in violation of the Establishment

---

**11.** It is important, when considering how the situation of the National Day of Prayer event having costs covered by the City's Fund would be interpreted by observers, to note that most of the attendees of the event were probably adults. *See Marsh*, 463 U.S. at 792, 103 S.Ct. 3330 (stating that an adult is "not readily susceptible to 'religious indoctrination,' or peer pressure") (citations omitted); *see also Widmar*, 454 U.S. at 274 n. 14, 102 S.Ct. 269 (stating that "[u]niversity students

... are less impressionable than younger students" and should be able to appreciate the government's neutrality toward religion even when a religious group is benefitting under a university program); *Mergens*, 496 U.S. at 250–51, 110 S.Ct. 2356 (stating that high school students are also able to distinguish between a government endorsement of religion and a neutral governmental policy that happens to aid religion).

Clause only when the government speaks for itself or manages a forum in favor of private religious expression. *See id.* at 764, 115 S.Ct. 2440. The plurality observed that "it is no violation [of the Establishment Clause] for government to enact neutral policies that happen to benefit religion." *Id.* While the concurring Justices gave a greater role to the conclusions of a reasonable observer in determining whether the government had endorsed the expression of a private speaker than the plurality, *see id.* at 777, 115 S.Ct. 2440 (O'Connor, J., concurring) and at 784–86, 115 S.Ct. 2440 (Souter, J., concurring), they also rejected the government's Establishment Clause argument observing that the city could require that a sign be placed on or near the cross explaining that the city did not endorse the expression of the private speaker, *id.* at 776, 115 S.Ct. 2440 (O'Connor, J., concurring) and at 784, 115 S.Ct. 2440 (Souter, J., concurring). The National Day of Prayer event was not the expression of the City itself and there is no allegation that the Fund was managed in a way that discriminated in favor of religious speech. The City maintained control over the content of the statement in the event's advertisement and could have modified it to decry any endorsement by the City of the event's content. Thus, we agree with the district court that the advertisement requirement is insufficient to demonstrate that the City endorsed the expression of the Gentalas. *See id.* at 764, 115 S.Ct. 2440.

■■■ Because we have concluded that the City engaged in viewpoint discrimination in violation of the First Amendment when rejecting the Gentalas' application to the Fund and that the exception for events which directly support religious organizations is unconstitutional on its face, and that the Establishment Clause does not provide a compelling interest justifying that discrimination, it is now apparent that the district court based its determination that the Gentalas were unlikely to succeed on the merits of this case on an erroneous legal conclusion. *See Roe,* 134 F.3d at 1402; *Easyriders,* 92 F.3d at 1493. More-

over, because the Gentalas' expressive freedoms were violated as a result of the City's unconstitutional activities, the Gentalas suffered an irreparable injury. *See S.O.C.,* 152 F.3d at 1148.

Accordingly, we reverse the district court's denial of the Gentalas' motions for preliminary and permanent injunctions and we remand for further proceedings.

*The City's Cross-appeal*

■■■ The City has also filed a cross-appeal contending that the district court abused its discretion by denying its motion for leave to amend its answer to assert a defense under the Arizona constitution. In *Widmar,* the Supreme Court concluded that Missouri's state constitutional defenses were insufficiently compelling to override free-speech interests protected by the Federal Constitution. *See Widmar,* 454 U.S. at 276, 102 S.Ct. 269. Because we have concluded that the City's denial of the Gentalas' application would have violated the Free Speech Clause, we conclude that the City's proposed amendment would have been futile and that the district court did not abuse its discretion by denying it leave to amend its answer. *See id.; Bonin,* 59 F.3d at 845.

Accordingly, we affirm the district court's denial of the City's motion for leave to amend its answer.

## CONCLUSION

While the idea of the government subsidizing a public prayer service raises obvious Establishment Clause concerns, the idea of excluding religious speakers from neutral government programs because of their identity and their message raises equally compelling Free Speech and Free Exercise questions. These principal guarantees of the First Amendment require the government to juggle conflicting obligations toward its citizens. On the one hand, the Establishment Clause obligates government to inspect vigilantly its practices and policies to ensure that they do not create the impression that government

is endorsing or favoring religion or any form of religious expression. On the other hand, the Free Speech and Free Exercise Clauses require the government to monitor carefully its policies and practices to ensure that they do not unnecessarily trammel on individuals' opportunities to engage in expressive conduct, especially expressive conduct which stems from religious faith and belief. As much as we would like to provide local, state and national governmental entities with bright lines and simple tests to simplify the task of making decisions in this complex and politically charged area, drawing exact lines and articulating formulaic tests is belied by the purposes of the First Amendment guarantees themselves. *See Lynch*, 465 U.S. at 678–79, 104 S.Ct. 1355.

 We do, however, offer some general guidance to the City of Tucson and other governmental decision-makers based on our examination of this appeal and our investigation of the relevant Supreme Court decisions in this area. Where the government has created a forum for expressive activities, and a private speaker meets the criteria for access to the forum, the speaker cannot be excluded merely because the speaker's expression addresses religion or adopts a religious perspective on an otherwise permissible topic. In addition, where the governmental forum includes the provision of financial subsidies or in-kind services, as long as those services are provided to all speakers in the forum on a religiously neutral basis, provision of such subsidies · or services to a speaker with a religious perspective will not violate the Establishment Clause.

Our resolution of the issues in a manner different from the City of Tucson and the district court should not be construed as to cast any doubt that the City and the court took their obligations seriously and carefully considered their conclusions. After reviewing the particular facts of this appeal, we have merely drawn the lines between the guarantees of the Free Speech and Establishment Clauses in a different fashion than did the City and the district court.

The City shall bear the costs on appeal.

AFFIRMED in part, REVERSED in part, and REMANDED.

PREGERSON, Circuit Judge, dissenting:

I dissent. The district judge got it right. Taxpayer funds may not be used to support a religious organization. And that is undisputedly what Appellants' organization is—a religious organization. *See* Appendix at 3, 5.

As the majority opinion notes, resolution of cases like this one "depend[ ] on the hard task of judging." *See supra* at 1059 (quoting *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 847, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (O'Connor, J., concurring)). Indeed, "[s]uch judgment requires the court to draw lines, sometimes quite fine, *based on the particular facts of each case.*" *Id.* (emphasis added). The facts of this case are crucial and should not be diluted.

Appellants' organization, the Tucson National Day of Prayer Committee, applied for financial support from a fund largely consisting of taxpayer money for an event whose stated purpose was to "organize an annual gathering of Tucson Christians." *See* Appendix at 3, 5. Appellants did not organize a National Day of Prayer for all Tucson residents of all faiths; their event was for Tucson Christians only. *See id.* Moreover, Appellants' application for funding clearly stated that an individual's membership in their organization, the Tucson National Day of Prayer Committee, would be *terminated* if the individual would not "pledge" to the Christian belief. *Id.* In fact, at no time during oral argument or in their briefs on appeal have Appellants denied that their organization is a "religious organization."

The constitutionality of the congressionally established National Day of Prayer is *not* at issue here. Appellants' event, for

"Tucson Christians," should not be confused with the national event that was created by congressional resolution in 1952. The language of the congressional resolution indicates that Congress, in declaring a "National Day of Prayer," intended the day to be a day for all Americans, of all faiths. As one representative noted, "[n]o single religious group can claim ownership or control of the National Day of Prayer; rather, it truly belongs to all Americans who seek divine guidance for themselves and for the country." 134 Cong. Rec. H2761–02 (May 12, 1988) (statement of Rep. Dymally).

Thus, this case is not about the constitutionality of the National Day of Prayer. The only issue presented in this case is whether the City of Tucson violated the Constitution by denying Appellants taxpayer funds to subsidize the cost of their event. Because I believe the City acted clearly within the bounds of the Constitution, I would affirm the well-reasoned decision of the district court.

## I

Appellants are active sponsors and organizers of the Tucson National Day of Prayer. Appellants requested permits and funding from the City of Tucson ("the City") to hold the event in the City's Demeester Outdoor Performance Center ("Demeester bandshell"). Appellants obtained the necessary permits and the event was held as planned, but the City denied Appellants' request for funding. As a result, Appellants' organization had to pay approximately $340 to rent equipment used for production of the event.

The City allows members of the public to use its parks for a wide variety of purposes. The Demeester bandshell is located in Tucson's Reid Park. Pursuant to Tucson Code sections 21–14 and 21–16, specific fees are charged for the use of event equipment, park bandshells, and other facilities owned by the City. Grants are available from the City's Civic Events Fund, on a limited basis, to help subsidize the cost of *civic* events. The Civic Events Fund consists of City money from the general fund appropriated by the City's Mayor and Council each year. The source of the funds includes *tax revenue,* user fees, and other sources of recurring and non-recurring revenue. Sponsors of events at Reid Park may request a grant from the Civic Events Fund through the City's Civic Events Subcommittee ("Subcommittee").

For the 1997 Tucson National Day of Prayer, the Appellants obtained permits to hold the prayer event in the Demeester bandshell. The event was carried on as planned, and Appellants do not allege that the City's actions impeded free speech at the event in any way. Rather, Appellants allege that the City discriminated against the organization by refusing to support the Tucson National Day of Prayer financially with funds from the Civic Events Fund. They are mistaken.

The Civic Events Fund exists to encourage and support civic events that celebrate the City's heritage, increase knowledge and understanding of issues that improve citizens' quality of life, generate community appeal and participation, contribute to tourism, or are otherwise identified as unique community events. A number of conditions must be met for an event to be eligible for City support. These conditions, which are listed in the City's "Civic Event Policy Statement and Evaluation Criteria" ("Policy") include: (1) the event must be sponsored by a non-profit organization or by individuals conducting the event on a non-profit basis; (2) the event must be open to the public and cannot discriminate against persons in any manner; and (3) the event sponsor must maintain liability insurance, maintain a financial accounting of the event, and acquire necessary permits from the City. The Policy further indicates that "events held in direct support of religious organizations" are not eligible for funding from the Civic Events Fund.

The City does not automatically award grants to all eligible events pursuant to the City's Civic Event Policy. Once the Sub-

committee determines that an event is "eligible" for funding, the Subcommittee, using "Evaluation Criteria," assesses the event to determine whether it is one that the City will co-sponsor. To determine whether an event should receive funding, the City considers a number of factors including: (1) the purpose and objectives of the event; (2) the extent to which the event generates broad community appeal and participation; (3) the event's need for support; and (4) the event's ability to obtain financial support from other public and private sources. In the past the City has refused to fund a number of non-religious events as well as events that the Subcommittee determined were "in direct support of religious organizations." On the other hand, the City has funded events sponsored by religious organizations that did not directly support religious organizations. For example, the City provided funding for a fishing clinic for disabled children that was co-sponsored by the Aid Association for Lutherans.

In this case, Appellants' event was designed to directly benefit their religious organization. Although Appellants argued that members of all faiths could have participated in the event, according to Appel-

lants' own *application*,[1] only those who "pledge" to the Christian belief could participate as members of their organization.[2] *See* Appendix at 5. Indeed, the Appellants' application for funding declared that the purpose of the event was to "organize an annual gathering of Tucson Christians to observe the National Day of Prayer." *Id.* at 3, 5. After reviewing the application, the Subcommittee refused to fund the event because it would directly support a religious organization.[3]

The majority finds that the City's refusal to fund the Tucson National Day of Prayer violated the First Amendment. I disagree for several reasons. First, the Civic Events Fund is not a limited public forum as the majority asserts. In fact, the majority's analysis of this case using "forum doctrine" is not appropriate given the nature of the Civic Events Fund. Second, the majority opinion disregards Supreme Court precedent which establishes that there is an important distinction between a government's refusal to fund protected activity and a government's actual denial of a person's constitutional rights. *See e.g., National Endowment for the Arts v. Finley,* 524 U.S. 569, 118 S.Ct. 2168, 2179, 141 L.Ed.2d 500 (1998); *Rust v. Sullivan,* 500

1. The majority claims that "the dissent relies on the Gentalas' original application for reimbursement from the Fund, and attachments thereto, which state that the National Day of Prayer event was organized for 'Tucson Christians.'" *See supra* at 1068. Indeed, the application for funding clearly indicated that the purpose of the event was "To organize an annual gathering of Tucson Christians to observe the National Day of Prayer," *see* Appendix at 5. This is what the Subcommittee had before it when it decided to reject the Gentalas' application for funding.

Moreover, question 10 on the application asks, "Does your organization require its members to pledge to any specific religious belief?" To which the Gentalas marked "Yes" and wrote in "Christian." Appendix at 5. The second part of question 10 asks, "If yes, would a person's membership be terminated if the person would not make such a pledge?" Again, the Gentalas marked "Yes." Appendix at 5. I am not aware of any case where any court found that a similar organization (that required its members to pledge to

a specific religious faith and would terminate a person's membership if they did not) was *not* a "religious organization."

2. The majority incorrectly asserts that the Gentalas' event was a "public prayer service conducted from such a perspective [that] would support members of Jewish and Christian religious organizations...." The prayer service, as Appellants' counsel admitted at oral argument, addressed a Christian perspective only. And the only individuals that spoke at the prayer service were Christians—they were not members of the Jewish faith as the majority opinion suggests.

3. Although the Subcommittee did not evaluate whether the event would otherwise meet the criteria for funding, it appears that the event would not because: (1) the Tucson National Day of Prayer Committee was not a non-profit organization; (2) money was collected at the event; and (3) it is highly doubtful that the event "did not discriminate against any persons in any manner" as required by the Policy.

U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Third, the City has a compelling state interest for excluding events that are "in direct support of religious organizations" from funding eligibility—compliance with the Establishment Clause. Accordingly, I would conclude that the City did not violate the Constitution when it refused to co-sponsor an event, that intended to "organize an annual gathering of Tucson Christians," using taxpayer funds.

## II

This is not a case involving the denial of "equal access" to City facilities; rather, it simply involves the denial of taxpayer funding. If the City had denied Appellants access to the Demeester bandshell, which is a traditional public forum, this would be a different case. But Appellants were not denied access to the bandshell. Thus, their Free Speech claim can succeed only if they can demonstrate that the Civic Events Fund is a type of forum protected by the First Amendment.

The majority contends that the Fund is a limited public forum [4] and that the City's refusal to fund events that directly support religious organizations constitutes viewpoint discrimination. I disagree. The majority's analysis of this case using forum doctrine is not appropriate because the Civic Events Fund is not a forum at all. In addition, the Supreme Court case which the majority urges is controlling, *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, is distinguishable.

A. The Civic Events Fund is Not a Forum.

The Supreme Court has identified three types of fora: the traditional public forum, the designated public forum, and the nonpublic forum. *See Arkansas Educ. Televi-*

sion *Comm'n v. Forbes*, 523 U.S. 666, 118 S.Ct. 1633, 1641, 140 L.Ed.2d 875 (1998). As explained in *Forbes*, if governmental property is not a traditional public forum or a designated public forum, it is either a nonpublic forum or is not a forum at all. *See id.* at 1641. I would find that Civic Events Fund is not a forum at all: (1) because the City's administration of the Civic Events Fund necessarily requires "editorial discretion," and (2) when "government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Rosenberger*, 515 U.S. at 833, 115 S.Ct. 2510.

The Court has recognized that when a government's administration of public property requires "editorial discretion," it should not be subject to review to determine if it is engaging in viewpoint discrimination. *See Forbes*, 118 S.Ct. at 1639–40; Alan E. Brownstein, *Alternative Maps for Navigating the First Amendment Maze*, 16 Const. Comment. 101, 135 (1999); *see also Finley*, 118 S.Ct. at 2184 (Scalia, J., concurring); *Fordham Univ. v. Brown*, 856 F.Supp. 684, 701–02 (D.D.C.1994). The Supreme Court's examples of such discretionary decisions include: a university's selection of a commencement speaker, a public institution's selection of speakers for a lecture series, or a television broadcaster's programming selections. *See Forbes*, 118 S.Ct. at 1639. In *Forbes* the Court explained that these actions "by [their] nature will facilitate the expression of some viewpoints instead of others." *Id.; see also Chicago Acorn v. Metropolitan Pier and Exposition Auth.*, 150 F.3d 695, 701 (7th Cir.1998) (noting that "[w]henever government is in the business of speech, whether it is producing television programs ... or *making grants* ... the exercise of editorial discretion is inescapable")

4. As noted in *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 n. 4 (9th Cir.1999), "[t]he contours of the terms 'designated public forum' and 'limited public forum' have not always been clear." (citations omitted). Here, the majority concludes that the Civic Events Fund is a "limited public forum." *Supra* at 1062. It is perhaps more precise to state that the majority finds that the Civic Events Fund is a "nonpublic forum open for a limited purpose." *DiLoreto*, 196 F.3d at 967. Nonetheless, for purposes of clarity, because the majority uses the term "limited public forum," I will use that term in my dissent as well.

(emphasis added). Consequently, simply because a government subsidy program serves some expressive purpose, government selectivity in funding private speech to further that purpose does not create a forum for First Amendment purposes. *See Finley*, 118 S.Ct. at 2183–85 (Scalia, J., concurring) (stating that the First Amendment "has no application to funding"); *Brownstein*, 16 Constit. Comment. at 134–35. Thus, forum doctrine and its prohibition against viewpoint discrimination is not applicable here.[5]

Moreover, the grant program in the present case is analogous to the grant program in *Finley*, which the Supreme Court concluded was not a limited public forum. *See* 118 S.Ct. at 2179. In *Finley*, the issue was whether the statute, requiring the National Endowment for the Arts ("NEA") to consider "decency" when awarding grants, violated the First Amendment. *See id.* at 2178–79. In analyzing the NEA grant program, the Court did not apply forum doctrine. *See id.* The Court explained that such analysis was not appropriate because when the government awards NEA grants, it "does not indiscriminately 'encourage a diversity of views from private speakers.'" *Id.* at 2178 (distinguishing *Rosenberger*). Consequently, the Court noted that the subjective and competitive grant process in *Finley* was significantly different from limited public forum cases because those cases involved "comparably objective decisions on allocating public benefits, such as access to a school auditorium or a municipal theater." *Id.* (distinguishing *Rosenberger* and *Lamb's Chapel v. Center Moriches*

*Union Free School Dist.*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)). Consequently, the Court concluded that the grant process in *Finley* was not a limited public forum and that the statute did not violate the First Amendment.

Like the grant process at issue in *Finley*, the City of Tucson did not create the Civic Events Fund to "indiscriminately 'encourage a diversity of views from private speakers.'" *Finley*, 118 S.Ct. at 2178 (quoting and distinguishing *Rosenberger*, 515 U.S. at 834, 115 S.Ct. 2510). And similar to the program in *Finley*, the process of awarding grants in this case is not an "objective" process. *See Finley*, 118 S.Ct. at 2178 (distinguishing selective grant process in *Finley* from *Lamb's Chapel* and other cases that involved "comparably objective decisions on allocating public benefits, such as access to a school auditorium or a municipal theater"). The Subcommittee in the present case evaluates organizations' applications for funding and chooses which events to fund based on a number of factors. As noted above, not all eligible events receive financial support from the Civic Events Fund. Accordingly, because the City did not create the Civic Events Fund to "indiscriminately 'encourage a diversity of views from private speakers,'" analysis under the forum doctrine is not appropriate. *Finley*, 118 S.Ct. at 2178.

Additionally, in concluding that the Civic Events Fund is a limited public forum, the majority disregards the critical distinction between a government's decision not to fund protected activity and the actual deni-

---

**5.** Even if I were to analyze this case using forum doctrine, I would still conclude that the City's actions were constitutional, especially in light of this court's recent decision in *DiLoreto*. *See* 196 F.3d 958; *see also Good News Club v. Milford Central Sch.*, 202 F.3d 502 (2d Cir.2000) (ruling that school's refusal to allow religious organization to use facilities was based on content, not viewpoint). In *DiLoreto*, we ruled that the school district's refusal to permit religious messages on a high school baseball field fence was a "permissible, content-based limitation on the forum, and *not*

viewpoint discrimination." *Id.* at 969–70 (emphasis added). In addition, in *DiLoreto* we rejected the argument that excluding religion as a subject or category always constitutes viewpoint discrimination. *Id.* at 969. We stated that such an argument "mischaracterizes the holding in *Rosenberger*" and we noted that in *Rosenberger*, "[t]he Court merely held that refusing to fund only religious viewpoints on otherwise-permissible subjects (i.e. pregnancy or homosexuality) was viewpoint discrimination." *Id.* at 970.

al of constitutional rights. *See Regan v. Taxation With Representation of Wash.,* 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (the government's "decision not to subsidize the exercise of a fundamental right does not infringe on that right"); *Fordham,* 856 F.Supp. at 702. Notably, the Supreme Court has repeatedly and forcefully emphasized this distinction. *See e.g., Finley,* 118 S.Ct. at 2179 (1998); *Rust v. Sullivan,* 500 U.S. at 193, 111 S.Ct. 1759; *Regan,* 461 U.S. at 549, 103 S.Ct. 1997; *Maher v. Roe,* 432 U.S. 464, 475, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). As the Court recently explained in *Finley,* "although the First Amendment certainly has application in the subsidy context, we note that the Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." 118 S.Ct. at 2179. Simply put, the government has "no obligation to fund the exercise of constitutional rights." *Tipton v. Univ. of Hawaii,* 15 F.3d 922, 926 (9th Cir.1994). In fact, the government:

> may "selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, 'the [g]overnment *has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.'*"

*Finley,* 118 S.Ct. at 2179 (quoting *Rust,* 500 U.S. at 193, 111 S.Ct. 1759) (emphasis added).

The majority does not explain why the important and " 'basic difference between direct state interference with a protected activity and state encouragement of an alternative activity' " is not relevant in the present case. *Rust,* 500 U.S. at 193, 111 S.Ct. 1759 (quoting *Maher,* 432 U.S. at 475, 97 S.Ct. 2376). Nor does the majority explain how, in light of the Court's instruction that "[a] refusal to fund protected activity, without more, cannot be equated with a disposition of a 'penalty' on that activity," *id.,* the City has burdened Appellants' free speech rights. Consequently, I cannot conclude that simply because the City of Tucson elects to selectively fund civic events, its refusal to fund Appellants' event violated the First Amendment.

Furthermore, it is clear that the City was justified in excluding events that were in direct support of religious organizations because "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust,* 500 U.S. at 194, 111 S.Ct. 1759. Events that obtain funding from the City of Tucson are advertised as having received City funding, and City employees operate light and sound equipment at these events. Additionally, during these events an announcement is made acknowledging that the City contributed to the services at the event. The majority argues that the City could have modified the policy to "decry any endorsement by the City" when such events are advertised. *Supra* at 1072. But the City should not have to engage in such a practice. The City created the Civic Events Fund and is entitled to obtain recognition that it participates as a co-sponsor of civic events in Tucson. *See Rosenberger,* 515 U.S. at 833, 115 S.Ct. 2510 ("when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes") (citing *Rust,* 500 U.S. at 194, 111 S.Ct. 1759).

As Justice Scalia recently noted, "[i]t is preposterous to equate the denial of taxpayer subsidy with measures 'aimed at the suppression of dangerous ideas.' " *Finley,* 118 S.Ct. at 2183 (Scalia, J., concurring) (quoting *Regan,* 461 U.S. at 550, 103 S.Ct. 1997). Here, there is no evidence that the City enacted the Policy to suppress speech or a particular viewpoint. The City excluded events that directly support religious organizations only to ensure that it complied with the Establishment Clause. This exclusion was permissible and did not violate the Free Speech Clause of the First Amendment.

B. *Rosenberger* is Distinguishable.

Contrary to Appellants' argument, the Supreme Court's recent decision in *Rosenberger* does not negate the well-established precedent discussed *supra*. In *Rosenberger*, the Court found that by subsidizing publications of student organizations with money from the Student Activity Fund, the University of Virginia had intended to "open a forum for speech" and "encourage a diversity of views from private speakers." *See id.* at 834, 837, 115 S.Ct. 2510. The Court accordingly concluded that the University had created a limited public forum. *See id.* at 837, 115 S.Ct. 2510. Because the University had created a limited public forum, the Court held that the University could not exclude all publications with religious editorial viewpoints from grant eligibility. *See id. Rosenberger* is distinguishable for several reasons.

First, the funding process in the present case is more akin to the grant process in *Finley* than the process used in *Rosenberger*. In *Rosenberger*, funding was available for all student organizations' publications that met the stated criteria and were "related to the educational purposes of the University," except those with religious editorial viewpoints. *Id.* at 824, 115 S.Ct. 2510. Here, the City provides financial support only to the events that meet the Policy's criteria *and* that the Subcommittee determines are most deserving. Thus, the City's grant program is quite different from the objective grant process at issue in *Rosenberger*.

Second, the Court emphasized in *Rosenberger* that the case did not involve "religious organizations." *See id.* at 844, 115 S.Ct. 2510. The Court noted that "if the State pays a church's bills it is subsidizing it, and we must guard against this abuse." *Id.* But the Court recognized that subsidizing a religious organization was not a "danger" in *Rosenberger* because "the student publication is not a religious institution" and "it is not a religious organization as [defined] in the University's own regulations." *Id.* In contrast, it is undisputed that Appellants' organization is a religious organization. *See* Appendix at 1, 3, 5.

Third, unlike the City in the present case which co-sponsors civic events, the University in *Rosenberger* was not promoting its own message.[6] *See Rosenberger*, 515 U.S. at 835, 115 S.Ct. 2510. As the Court noted in *Rosenberger*, all publications that received funding from the Student Activity Fund printed a disclaimer declaring "that the student groups are not the University's agents, are not subject to its control, and are not its responsibility." *Id.* In contrast, as noted above, events that obtain funding from the Civic Events Fund are *advertised* as being co-sponsored by the City of Tucson. Moreover, an announcement is made at the event declaring that the event is co-sponsored by the City.

Fourth and most importantly, taxpayers did not fund the Student Activity Fund in *Rosenberger*.[7] *See* 515 U.S. at 841, 115

---

6. This fact also distinguishes the present case from *Board of Regents of the University of Wisconsin System v. Southworth*, —— U.S. ——, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). In *Southworth*, the Court ruled that a public university may charge its students an activity fee to fund a program to facilitate extracurricular student speech. *See id.* The Court, however, emphasized that:

> Our decision ought not be taken to imply that in other instances the University, its agents or employees, or—of particular importance—its faculty are subject to First Amendment analysis which controls in this case. Where the University speaks, either in its own name or through its regents or officers, or in myriad other ways through its diverse faculties, the analysis likely would be altogether different. *The Court*

has not held, or suggested, that when the government speaks the rules we have discussed come into play.

*Id.* 120 S.Ct. at 1357 (emphasis added) (citations omitted).

7. Perhaps the most troubling aspect of the majority's opinion is the suggestion that the student fees in *Rosenberger* and the general tax assessments in the present case are not distinguishable, *see supra* at 1069, despite the Court's forceful language in *Rosenberger* that the case "cannot be read as addressing an expenditure from a general tax fund." 515 U.S. at 841, 115 S.Ct. 2510. The majority argues that this distinction does not apply here "[g]iven that the Fund is administered by a City Council composed of duly-elected representatives of the residents of the City of

S.Ct. 2510. The Court in *Rosenberger* stressed this fact noting that:

> [T]he $14 paid each semester by the student is not a general tax designed to raise revenue for the University.... *Our decision then cannot be read as addressing an expenditure from a general tax fund.* Here, the disbursements from the fund go to private contractors for the cost of printing that which is protected under the Speech Clause of the First Amendment. That is a far cry from a general public assessment designed and effected to provide financial support for a church.

*Id.* at 841, 115 S.Ct. 2510 (emphasis added). Justice O'Connor's concurrence in *Rosenberger* also highlighted this point, stating that "[p]ublic funds may not be used to endorse the religious message," and "[*t*]*hese decisions* [ ] *provide no precedent for the use of public funds to finance religious activities.*" *Id.* at 847, 115 S.Ct. 2510 (O'Connor, J., concurring) (emphasis added). Thus, the Court sent a very clear message in *Rosenberger* that taxpayer money may not be used to pay a religious organization's bills. Indeed, *Rosenberger* did not change this rule—it reinforced it.

### III

Even assuming that the City's Policy violated the Free Speech Clause, the Policy is not unconstitutional if it serves a compelling state interest and is narrowly drawn to achieve that end. *See Widmar v. Vincent,* 454 U.S. 263, 270, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). The City of Tucson enacted the Policy that excludes events which directly support religious organizations to avoid violating the Establishment Clause. As even the majority concedes, compliance with the Establishment Clause is a compelling state interest. *See supra* note 9 at 1066 (citing *Capitol Square Rev. and Advisory Bd. v. Pinette,* 515 U.S. 753, 761–62, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) and *Lamb's Chapel* ). Because City demonstrated that the Policy was necessary to avoid violating the Establishment Clause, it is constitutional.[8]

The Establishment Clause forbids "sponsorship, financial support, and active involvement in religious activity." *Committee for Public Education & Religious*

Tucson to provide civic events for the benefits of the residents of the City of Tucson." *Supra* at 1069, n. 10. I strongly disagree. That the taxpayer funds are administered by "duly-elected officials" does not insulate this or any other case from concerns about violations of the Establishment Clause. The Establishment Clause exists, in part, to protect those in the minority, who without protection under the First Amendment, could be forced to live under a majority-imposed religious regime. *See Lee v. Weisman,* 505 U.S. 577, 592, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (stating that the "inspiration for the Establishment Clause" was the lesson that "in the hands of the government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce.").

8. In addition to being necessary to avoid violating the Establishment Clause, the Policy is sufficiently narrow. The City's Policy did not exclude all events with any type of religious theme, it only excluded events that *directly* support religious organizations. For example, the City funded the fishing clinic for handicapped children which was sponsored by the Lutheran Church, a Mormon Battalion event that celebrated the placement of a monument in a city park which commemorated a historical event in Tucson, and a Las Posadas festival. The majority argues that the City's decision to fund the Las Posadas event demonstrates that the City is engaging in viewpoint discrimination. *See supra* at 1065. I disagree. The Las Posadas event was a play that was sponsored by a public school. Although the play told a religious story, the event did not directly support any religious organization and more importantly, the funding of that event was never challenged.

The fact that the City funded these events demonstrates that the City's Policy is not hostile towards religion. Under the funding criteria, religious organizations can receive funding for events so long as the event does not *directly* support the religious organization. The City could have enacted more restrictive criteria that excluded from funding all events that had any relationship with religion, direct or indirect. Instead, the City chose to adopt narrow criteria that would simply ensure that taxpayer money was not used to support religious organizations in violation of the Establishment Clause.

*Liberty v. Nyquist,* 413 U.S. 756, 772, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (citations omitted). As a majority of the Supreme Court recognized in *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989):

> this Court has come to understand the Establishment Clause to mean that government *may not promote* or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.

*Id.* at 590, 109 S.Ct. 3086 (footnotes omitted) (emphasis added). The Court further noted that the Establishment Clause "means at least" that "[n]o tax in any amount, large or small, can be levied to support religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." *Id.* at 591, 109 S.Ct. 3086 (quoting *Everson v. Board of Educ. of Ewing,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947)). The Court explained that, "whether the key word is 'endorsement,' 'favoritism,' or 'promotion,' the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief...." *Id.* at 593–94, 109 S.Ct. 3086 (citing *Lynch v. Donnelly,* 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)).

It is clear that if the City funded events that directly support religious organizations, the principles stated above would be violated. Appellants' event, a gathering and prayer service for "Tucson Christians," is without question, religious activity. The City may not sponsor or provide financial support for such religious activity. *See Nyquist,* 413 U.S. at 772, 93 S.Ct. 2955. In addition, events that receive financial support from the Civic Events Fund are advertised as being co-sponsored by the City of Tucson. But the City may not promote or affiliate itself with any

religious doctrine or organization. *See County of Allegheny,* 492 U.S. at 590, 109 S.Ct. 3086. Finally, the City may not use taxpayer funds, "in any amount, large or small" to support religious activities or organizations. *Id.* at 591, 109 S.Ct. 3086; *see also Rosenberger,* 515 U.S. at 840–41, 115 S.Ct. 2510; *Nyquist,* 413 U.S. at 780, 93 S.Ct. 2955.

The majority asserts that the City could fund events that directly support religious organizations because such conferral of incidental benefits does not violate the Establishment Clause. *See supra* at 1068–69. I agree that the conferral of incidental benefits does not necessarily implicate the Establishment Clause. However, I do not agree that the award of taxpayer funds to support a religious organization constitutes an "incidental benefit." Indeed, all of the cases cited by the majority that deal with incidental benefits are distinguishable. *See* discussion *infra.*

For example, the majority cites *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). The issue in *Widmar,* however, was simply whether the University of Missouri's policy, which allowed all student groups to use its facilities, except for religious groups, was constitutional. *See id.* at 273, 102 S.Ct. 269. The Court found that the "benefits" to religion were incidental because they merely involved the use of University facilities. In contrast, here, Appellants are seeking more than mere "use" of a forum; they are seeking financial support for their event. This benefit is direct and is not "incidental" not only because taxpayers would be paying the fees owed by Appellants' organization, but also because money was collected at the event for the organization. Moreover, the Court in *Widmar* emphasized that "[t]he basis for our decision is narrow" because the University "created a forum *generally open* to student groups." *Id.* at 277, 102 S.Ct. 269. But in the present case the City of Tucson did not make the Civic Events Fund generally available to all non-religious organizations.

In addition, the present case is distinguishable from *Widmar* because in that case the Court pointed out that an "open forum in a public university does not confer any imprimatur of state approval on religious sects or practices." *Id.* at 276, 102 S.Ct. 269. If the City of Tucson awarded public funds to an event designed to "organize a gathering of Tucson Christians," it would send a message that the City approved of the religious organization. Thus, it cannot be said that the "incidental benefits" involved in *Widmar* are analogous to the benefits Appellants' organization sought.

The majority also cites *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). The issue in *Lynch* was whether a city could display the creche on city property without violating the Establishment Clause. *See id.* at 685–88, 104 S.Ct. 1355. The creche had been displayed on the city property for 40 or more years and was only a small portion of a larger display. *See id.* at 671, 104 S.Ct. 1355. The Supreme Court held that the display of the creche on city property did not violate the Establishment Clause because "whatever benefit to one faith or religion or to all religions [was] indirect, remote, and incidental." *Id.* at 683, 104 S.Ct. 1355. Unlike the benefits sought in present case, the Court in *Lynch* noted that "[n]o expenditures for maintenance of the creche have been necessary." *Id.* at 684, 104 S.Ct. 1355. In addition, the Court pointed out that *Lynch* "does not involve a direct subsidy to church-sponsored schools or colleges, or other religious institutions...." *Id.* at 685, 104 S.Ct. 1355. In contrast, if the City in the present case were to fund Appellants' religious organization, the benefit to that organization would be neither indirect, remote, or incidental. Indeed, the "benefit" would constitute direct financial support of Appel-

lants' organization because the City would be paying that organization's bills.[9] Thus, the benefit sought by Appellants in this case is not analogous to the incidental benefits involved in either *Lynch* or *Widmar.*

It is also clear that the City of Tucson may not fund events that directly support religious organizations under *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105 (1975). In *Lemon,* the Supreme Court set forth three "tests" to determine whether a government practice violates the Establishment Clause. *See id.* at 612–13, 91 S.Ct. 2105. "Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance not inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion." *County of Allegheny,* 492 U.S. at 592, 109 S.Ct. 3086 (citing *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105). It is undisputed that the purpose of the City's Civic Events Fund is secular and that it neither advances nor inhibits religion in its principle or primary effect. However, if the City allowed events that directly support religious organizations to apply for funding, it would "foster an excessive entanglement with religion." *Id.* The City's Subcommittee, which evaluates and determines which events should receive funding, would have to pick and choose between various religious organizations, which is clearly impermissible. And the City would be serving as a co-sponsor of the religious event, providing staff at the event and financial support.

Furthermore, if the City of Tucson had funded Appellants' event, the City would have violated the endorsement test. Under the "endorsement test" the appear-

9. The majority argues that the benefit is not "direct" because the City of Tucson would not be required to make "direct" money payments to Appellants' organization. *See supra* at 1069. I disagree. As Judge Sneed stated during oral argument, such a distinction "doesn't make any sense—a concession to a particular religious organization in the form of the government spending money on their behalf as opposed to giving them the money to spend for the same cause really doesn't make any sense. In any event, an economic benefit is being made to a religious organization."

ance of government endorsement of religious messages is unconstitutional. *See County of Allegheny,* 492 U.S. at 592–601; *Tucker v. State of California Dept. of Educ.,* 97 F.3d 1204, 1215 n. 7 (9th Cir. 1996). Although Justice Scalia, writing for the majority, rejected the endorsement test in *Pinette,* five justices supported the test in that case. *See* 515 U.S. at 786, 787–88, 797–99, 817–18, 115 S.Ct. 2440; *see also Tucker,* 97 F.3d at 1215 n. 7; Kathleen M. Sullivan, Parades, Public Squares and Voucher Payments: Problems of Government Neutrality, 28 Conn. L.Rev. 243, 253 (1996). Under the endorsement test, "when the reasonable observer would view a government practice as endorsing religion . . . it is our duty to hold that practice invalid." *Pinette,* 515 U.S. at 777, 115 S.Ct. 2440 (O'Connor, J., concurring). Accordingly, the Establishment Clause "imposes affirmative obligations that may require a State, in some situations, to take steps to avoid being perceived as supporting or endorsing a private religious message." *Id.* (O'Connor, J., concurring). Indeed, "at the very least, [the Establishment Clause] prohibits government from appearing to take a position on questions of religious belief." *Id.* at 799, 115 S.Ct. 2440 (Stevens, J., dissenting) (quoting *County of Allegheny,* 492 U.S. at 593–94, 109 S.Ct. 3086).

In the present case, the Civic Events Fund excludes events that directly support religious organizations to avoid the appearance of City-endorsed religious speech. Events that receive funding are advertised as having received City funding. Even if the City were to stop advertising funded events and include a disclaimer, the appearance of endorsement would still exist.[10] Citizens of Tucson have access to information about how the City spends taxpayer funds. A reasonable individual, upon learning that the City allocated public money to subsidize an event for "Tucson Christians," would perceive that the City supports the Christian faith or religion in general. This is impermissible under the Establishment Clause. *See Pinette,* 515 U.S. at 777, 787–88, 799, 115 S.Ct. 2440; *Allegheny,* 492 U.S. at 593–94, 109 S.Ct. 3086; *Tucker,* 97 F.3d at 1215. Recognizing this threat, the City's funding criteria correctly excludes events that directly support religious organizations.

If the City's Policy did not exclude events that directly support religious organizations, the City would either have to terminate the grant program entirely, or fund every religious event that requested funding. The Establishment Clause clearly prohibits government from preferring one religion over another. Thus, the City could not continue to selectively award grants to "civic events" because such subjectivity would certainly create excessive entanglement with religion in violation of the Establishment Clause. *See Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105.

## IV

The use of taxpayer money to pay a religious organization's bills is a blatant example of an Establishment Clause violation. *See Rosenberger,* 515 U.S. at 841, 844, 115 S.Ct. 2510; *Nyquist,* 413 U.S. at 780, 93 S.Ct. 2955. Even assuming that the City had adopted a totally "neutral" policy, the result would be the same—taxpayer money would still be used to pay the bills of religious organizations, which is clearly prohibited by the Establishment Clause. *See Rosenberger,* 515 U.S. at 844, 115 S.Ct. 2510; *Nyquist,* 413 U.S. at 780, 93 S.Ct. 2955.

As Justice O'Connor declared in *Rosenberger,* there is "no precedent for the use of public funds to finance religious activities." 515 U.S. at 847, 115 S.Ct. 2510 (O'Connor, J., concurring). The majority

---

**10.** The majority argues that "[i]t is important, when considering how the situation of the National Day of Prayer event having costs covered by the City's Fund would be interpreted by observers, to note that most of the attendees of the event were probably adults." *See supra* note 11 at 1070. There is absolutely no support for this conclusion in the record. There is no evidence that the event was geared towards adults or that most of the attendees were adults. Thus, this argument is based on pure speculation.

has not pointed to a single case where the Supreme Court or this court upheld the use of *taxpayer* funds to directly support a religious organization.

The majority asserts that the City should award grants to "all speakers in the forum on a religiously neutral basis," and that such conduct would not violate the Establishment Clause. *See supra* at 1072. Clearly that is not a realistic option here. The City does not have unlimited funds to financially support civic events. Under the current policy, the City evaluates applications and only funds those events that the Subcommittee determines will best further the City's goals. Moreover, "[t]he Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions ... and not all state policies are permissible under the Religion Clauses simply because they are neutral in form." *Pinette*, 515 U.S. at 777, 115 S.Ct. 2440 (O'Connor, J., concurring).

The City of Tucson's Civic Event Policy is constitutional. Accordingly, I would affirm the decision of the district court.

# APPENDIX

## To Judge Pregerson's Dissent.

CITY OF ██ APPLICATION FOR CIVIC ▮ ▮T SUPPORT

Event Name: _National Day of Prayer_ Date(s): _May 1, 1992_

Event Location: _Reid Park Bandshell_ Hours: _6:30 - 8:30 PM_

Event Sponsor: _Tucson National Day of Prayer Committee_ ✱✱ See below

Sponsor Status: ✱✱/ non-profit organization ✓ individuals

Contact Person: _Pat Gentala, City Coordinator_ Phone: _749-2685_

Address: _10171 E. Rio De Oro Dr., Tucson, AZ 85749_

✱✱ _This year's co sponsor required by event insurance is Tucson Association of Evangelicals_

To the best of my knowledge, the information submitted in this application is correct. If the event is authorized City support, I agree to (1) maintain a financial accounting of the event, and provide city staff prompt access to the event financial records and other information related to the sponsoring organization, upon request; (2) pay for any City support accepted beyond that allocated by the Mayor and Council; and (3) obtain the required event permits, and liability insurance as determined by the City's Risk Manager (791-4728), and (4) acknowledge through event advertising and an announcement during event that the City has contributed services to the event.

Signature: _Patricia E. Gentala_ Date: _4/16/92_

INSTRUCTIONS FOR APPLYING FOR CIVIC EVENT SUPPORT

1. Please read "Civic Event Policy Statement and Funding Criteria" (attached) to ensure that your event meets the established criteria, and to understand how your application will be considered.
2. If you need assistance in completing this application, including identifying the City services you wish to request, contact the City's Civic Event Coordinator, Development Services Center (791-5550), or the Parks Civic Event Coordinator (791-4873).
3. Submit the completed application by one of the following methods:

Fax: 791-4973

Mail:

Civic Events
Management Research Division
City of Tucson
P.O. Box 27210
Tucson, Arizona 85726-7210

Hand Delivery:

Civic Events
Management Research Division
4th Floor, City Hall
255 W. Alameda
Tucson, Arizona

You will be notified by the Management Research Division about the Civic Event Subcommittee's recommendation for your event, and the date the Mayor and Council will consider the Subcommittee's recommendation.

REGARDLESS OF THE OUTCOME OF YOUR REQUEST FOR FEE WAIVERS THROUGH THE CIVIC EVENT FUNDING PROCESS, YOU MUST CONTACT THE DEVELOPMENT SERVICES CENTER (CIVIC EVENT COORDINATOR, 791-5550) AT LEAST 60 DAYS BEFORE THE EVENT TO OBTAIN ASSISTANCE IN COORDINATING CITY SERVICES TO THE EVENT, INCLUDING OBTAINING NECESSARY INSPECTIONS, ACQUIRING CITY PERMITS AND ARRANGING FOR FEE WAIVED OR PAID CITY SERVICES TO BE RECEIVED.

10/8/92

1.

APPLICATION FOR CIVIC EVENT SUPPORT
Page -2-

1. Indicate whether this application is for a first time event, annual on-going event, or one-time event, and categorize the event as historical, cultural, ethnic, fund-raiser, or other.

First Time Event (Annual On-Going Event) One Time Event

 Category: _Historical_

2. Explain how the event meets the evaluative criteria listed in "Civic Event Policy Statement and Evaluative Criteria," (attached). Include comments about the purpose and objectives of the event, why the event is held, how the community participates in the event, who benefits from the event, and any other relevant information. Attach an additional sheet if necessary.

 _Please see attached page._

3. Please verify (with your initials) that the event:

 _PEJ._ Will be open to the public

 _PEJ._ Will not discriminate against patrons

4. Identify event activities (games, raffles, provision of food and alcohol) and whether there will be charges for each.

 Activity Charge (Yes/(No))

 _No admission charge; No Fees; Free will_
 _offering taken at close of program_
 _See attached page for description of_
 _activities_

5. If you will use Parks and Recreation display booths and plan to rent the booths to others, what will you charge for the booths?
 _Not applicable_
 full double booth: $_____ single booth: $_____

 .0/8/92

2.

# The National Day of Prayer
Application for Civic Event Support
Page 2, question 2

Mayor Miller has proclaimed "A Day of Prayer" in our community in coordination with the annual National Day of Prayer. His proclamation clearly states how prayer and especially the observance of a national day of prayer is part of the historical and cultural heritage of our city and nation.

The purpose of our committee is to organize an annual gathering of Tucson Christians to observe this day. We have invited the participation of over 500 Tucson area churches and Christian ministries, including many different denominations and ethnic groups. We have contacted over 25 different public officials, inviting their participation and asking for specific prayer requests. The Air Force community will be represented.

The event will be hosted by a local radio announcer. There will be a time of praise and worship led by both a youth choir and an adult choir. Pastors from nine different churches will lead the participants in prayer for local, state and national issues including the following:

- Improved relationships between different segments of our society.

- National, state and local leaders and their specific prayer requests.

- Law enforcement and emergency services.

- Youth, families, neighborhoods and the homeless.

- Educators and schools.

Patriotism will be emphasized in the decorations and music.

3.

APPLICATION FOR CIVIC EVENT SUPPORT
Page -3-

6. Please provide the following information about the event.

| | Projected | Actual From Last Event Occurrence |
| --- | --- | --- |
| Event Attendance: | 700-900 | 700 (1995 at Reid Park) |
| Gross Revenues: | $ 400. (offerings) | $ 393.84 |
| Expenses: | $ 500. not counting park<br>$ 340. park expenses | $ 404.54 |
| Net Revenues Or Fund Raised Amount: | $ <100> to be made up by donations<br>plus $340. park expenses | $ <10.07> |
| Amount Contributed To Beneficiary: | $ 0 | $ 0 |

Please explain how any portion of net revenues not contributed to the beneficiary will be used:

_Balance to be left for next year's event_

7. List the other sources of event funding that you have or will apply for, and any amount you know you will receive.

| Source | Amount |
| --- | --- |
| Donations | |
| | |
| | |
| | |
| | |

8. Explain the effect upon the event should the event not receive City support or receive less support than requested, including whether the event will pay for some or all of the City services it is requesting.

_It is difficult for us to afford adequate sound equipment, lighting, and rental fees which include set up and tear down time. Most fees are due before the event so offerings taken at the close do not cover them. As much is possible, that money is reserved for next year. Without help we will have inadequate Stage and sound package, as previous years did._

11/18/96

4.

APPLICATION FOR CIVIC EVENT SUPPORT
Page -4-

9. Please provide the following information about the non-profit organization sponsoring the event.

 Organization's Purpose: *To organize an annual gathering of Tucson Christians to observe the National Day of Prayer*

 Annual budget: $ _____ Number of Employees: *0*

 Organization's Funding Sources:

 | Source | Amount |
 | --- | --- |
 | *Donations* | |
 | | |
 | | |
 | | |

10. Does your organization require its members to pledge any specific religious belief?
 *Christian* yes *✓* no_____

 If yes, would a person's membership be terminated if the person would not make such a pledge?
 yes *✓* no_____

11. Please complete the following affirmative action profile for your non-profit organization by providing the number of staff and board members in each category.

 | | Total | Female | Male | Black | Hispanic | Native American | White | Other |
 | --- | --- | --- | --- | --- | --- | --- | --- | --- |
 | Staff | | *2* | *10* | *2* | *1* | | *8* | *Chinese 1* |
 | Board of Directors | *7* | *4* | *3* | | | | *7* | |

---

## TO BE COMPLETED BY CITY STAFF

### COSTS OF REQUESTED CITY SUPPORT

Parks and Recreation ..................... $ _____

Solid Waste Management ................... $ _____

Police ................................... $ _____

Transportation ........................... $ _____

Other $ _____

Total Costs �emph

11/18/94

·5.

........... FOR CIVIC EVENT SUPPORT • REQUEST FOR CITY SERVICES

Page -5- Committee

EVENT NAME: _Tucson National Day of Prayer_ SPONSOR: _Tucson National Day of Prayer_

EVENT DATE(S): _May 4, 1990_ HOURS: _6:30/8:30_ LOCATION: _Reid Park Bandshell_

Use this form to identify the City services you are requesting for your Civic Event. If you need assistance completing this form, contact the Development Services' Civic Event Coordinator (791-5550).

| PARKS AND RECREATION (non-waivable deposits required for some rentals) | FY 95-96 FEE (per unit) | QUANTITY REQUESTED | TOTAL COST |
|---|---|---|---|
| Display Booth (2 booths per unit; Limit: 38 units/ 76 total booths; 3 days or less) | | | |
| - without electrical | $ 70 | | $ |
| - with standard electrical | $ 130 | | $ |
| Ticket Booth (3 days or less; Limit 4) | | | |
| - without electrical | $ 100 | | $ |
| - with standard electrical | $ 120 | | $ |
| Portable Staging (3 days or less; Limit: call Parks) | | | |
| - Small Stage (16' X 16' or less) without electrical | $ 165 | | $ |
| with standard electrical | $ 205 | | $ |
| - Large Stage (more than 16' X 16') without electrical | $ 300 | | $ |
| with standard electrical | $ 340 | | $ |
| Bleachers (1 week or less; Limit: call Parks) | | | |
| - 3-Tier (50 seats) | $ 230 | | $ |
| - 8 x 15 (80 seats) | $ 230 | | $ |
| - 10-Tier (160 seats) | $ 360 | | $ |
| Kennedy Park Fiesta Puestos (built-in booths) | | | |
| - Small booths (3 days or less; Limit: 9) (Deposit: $ 60 per booth) | $ 60 | | $ |
| - Large booth (3 days or less Limit: 1) (Deposit: $ 120) | $ 120 | | $ |
| Public Address Audio Equipment | | | |
| - Portable P.A. System (3 days or less; Deposit: $ 100; Limit: 2) | $ 25 | | $ |
| - Speakers (crate, cables) (3 days or less; Deposit: $ 50; Limit: 4) | $ 20 | | $ |
| - Amplifier (crate) (3 days or less; Deposit: $ 100; Limit: 1) | $ 30 | | $ |
| - Microphones (cables) (3 days or less; Deposit: $ 12; Limit: 3) | $ 4 | | $ |
| - Extension Cord (100') (3 days or less; Deposit: $ 10; Limit: 1) | $ 2.50 | | $ |
| Amphitheaters/Bandshells (per day; Deposit: $ 500) | | | |
| - Himmel Park Amphitheater | $ 10 | | $ |
| - Bandshells (Udall/Armory/Kennedy Parks) | $ 75 | | $ |
| - Tucson Rodeo Grounds | $ 200 | | $ |
| Picnic Table (3 days or less; Limit: 25) | $ 28 | | $ |
| Food Serving Table (3 days or less; Limit: 9) | $ 15 | | $ |

3/95

6.

APPLICATION FOR CIVIC EVENT SUPPORT + REQUEST FOR CITY SERVICES
Page -6-

**PARKS AND RECREATION (CONT.)** FY 95-96 FEE (per unit) **QUANTITY REQUESTED** **TOTAL COST**

DEMEESTER OUTDOOR PERFORMANCE CENTER
(Deposit: $ 300)

*Set up time 2hrs (4:30-6:30)*
*teardown time 1hr (+ill 9:30)*

Stage Packages (Two Hour Minimum Charge)

- Stage Package A: with normal lighting ............. $ 20 per hour _____ $ _____
- Stage Package B: with normal lighting, ........... $ 30 per hour ✓ *5hrs* $ *150.00*
 some inside facilities
- Stage Package C: with normal lighting, ............ $ 40 per hour _____ $ _____
 all inside facilities

Audio/Theatrical Lighting Packages (Daily Charge) *30.00 / night*

- Audio/Theatrical Lighting A: ........................ $ 40 per day ✓ *1* $ *30.00*
 (description attached)
- Audio/Theatrical Lighting B: ........................ $ 90 per day _____ $ _____
 (description attached)
- Audio/Theatrical Lighting C: ........................ $ 160 per day ✓ *1* $ *160.00*
 (description attached)

ADDITIONAL ELECTRICAL SERVICES

- Additional electrical outlets (per outlet) ......... $ 1 _____ $ _____
- Area lighting (per light pole) ..................... $ 20 _____ $ _____

PARKS AND RECREATION TOTAL COSTS ....................................................... $ _____

**SOLID WASTE MANAGEMENT DEPARTMENT**

Automated Refuse Containers (3 days or less)

- 90 Gallon ............................................ $ 22.00 _____ $ _____
- 350 Gallon ........................................... $ 52.25 _____ $ _____

Metal Refuse Containers

- Toter 3 cubic yards ................................. $ 82.25 _____ $ _____
- Wagon 20 cubic yards ................................ $ 136.00 _____ $ _____
- Roll-Off 20 cubic yards ............................. $ 145.50 _____ $ _____
- Roll-Off 30 cubic yards ............................. $ 181.25 _____ $ _____
- Roll-Off 40 cubic yards ............................. $ 217.00 _____ $ _____

SOLID WASTE MANAGEMENT TOTAL COSTS ....................................................... $ _____

**OTHER DEPARTMENTAL SERVICES**

Other City services may be requested, as long as the services are typical civic event related services. Examples of such services are street sweeping and additional electrical services. Indicate the service requested. Staff will develop cost estimates for the services, based on hourly labor rates (estimated at $ 20 per hour), equipment costs (based on hourly rates for different types of vehicles and equipment), and the costs of materials used.

| Service Requested | Dept | Labor (@ $20/hr) | Equipment | Materials | Total |
|---|---|---|---|---|---|
| *off duty police* | | | | | |
| | | | | | |
| | | | | | |

5/95

APPLICATION FOR IVIC EVENT SUPPORT
Page -7-

### AUDIO AND LIGHTING RENTAL PACKAGES FOR DORCESTER OUTDOOR PERFORMANCE CENTER USERS

Audio and lighting charges are in addition to facility rental fees. Audio and lighting equipment is operable only by City staff (labor charges are included in the rental prices). All packages include signal processing and communications as needed.

#### AUDIO PACKAGES

AUDIO PACKAGE "A" @ $40 PER DAY
- 4-channel power mixer, 2 small speakers, and miscellaneous stands and cables as needed

AUDIO PACKAGE "B" @ $90 PER DAY
- 12-channel mixer, 2 medium speakers, 500-600 watts, and miscellaneous stands, direct boxes and cables as needed

AUDIO PACKAGE "C" @ $160 PER DAY
- 12-channel mixer, 2 large full-range speakers, 4 floor monitors, 2,500 watts, and miscellaneous stands, direct boxes and cable as needed.

AUDIO PACKAGE "D" @ $1,400 PER DAY
- 6 JBL 4871 concert series speakers, 24-channel main mixer, floor monitors and side fills, 4,000 to 4,500 watts, and miscellaneous stands, direct boxes, and cables as needed.

#### LIGHTING SYSTEMS

LIGHTING SYSTEM "A" @ $30 PER DAY
- Four 1,000 watt pars, no dimmer control

LIGHTING SYSTEM "B" @ $60 PER DAY
- 12 - 16 instruments pars, fresnels, ellipsoids, 6 channel 2.4k, 2 scene controllers

Larger lighting systems are available, up to 32 channels at 2.4K with 101 scene controller. Priced on an individual basis.

10/8/92

8.