**ALLIANCE OF AUTOMOBILE MANUFACTURERS, et al., Plaintiffs,**

v.

**Jane HULL, et al., Defendants.**

**No. CIV 00–1324–PHX–PGR.**

United States District Court,
D. Arizona.

March 30, 2001.

---

Daniel Joseph McAuliffe, Matthew Paul Fischer, III, Snell & Wilmer LLP, Phoenix, AZ, Theodore B. Olson, Marjorie E. Lewis, Theodore J. Boutrous, Jr., Douglas R. Cox, Gibson Dunn & Crutcher LLP, Los Angeles, CA, Thomas H. Dupree, Jr., Gibson Dunn & Crutcher LLP, Washington, DC, for Plaintiffs.

Richard R. Hubbard, Lisa Daniel Flores, Office of Governor, Paul Arthur Bullis, Nancy M. Bonnell, Office of the Attorney General, Timothy Andrew Nelson, Paul Arthur Bullis, Nancy M. Bonnell, Office of the Attorney General, Scot C. Stirling, George Ian Brandon, Sr., Peter Shawn Kozinets, Steptoe & Johnson LLP,

Phoenix, AZ, Charles G. Cole, Shannen W. Coffin, Steptoe & Johnson LLP, Washington, DC, for Defendants.

## ORDER

ROSENBLATT, District Judge.

This case involves a challenge to the constitutionality of Arizona House Bill 2101, codified as ARIZ.REV.STAT. § 28–4460. Plaintiffs are the Alliance of Automobile Manufacturers and the Association of International Automobile Manufacturers (hereinafter collectively referred to as "the manufacturers" or "plaintiffs"), two non-profit trade associations whose members manufacture and distribute motor vehicles. Members of these organizations include several of the world's largest automobile manufacturers, some of whom have filed declarations in support of plaintiffs' motion [1].

Defendants are Jane Dee Hull, Governor of Arizona; Janet Napolitano, Attorney General of Arizona; and Mary Peters, Director of the Arizona Department of Transportation. The Court permitted the Arizona Automobile Dealers' Association ("AADA") to intervene as a party-defendant on August 7, 2000. Additionally, the National Automobile Dealers Association ("NADA") filed an *amicus curiae* brief with the permission of the Court in support of the statute's constitutionality.

Plaintiffs filed their complaint on July 12, 2000 seeking declaratory and permanent injunctive relief and simultaneously filed a Motion for Preliminary Injunction ("Motion"). On August 23, 2000, NADA, as *amicus curiae*, and defendants, including the AADA as intervenor, filed a total of four briefs including exhibits, affidavits and declarations in opposition to plaintiffs' Motion. On September 26, 2000, plaintiffs filed their Reply in support of the Motion. Oral argument was held on March 5, 2001 and the Court took the matter under advisement.

The present statute is not an entirely new proposition. Arizona has regulated the automobile industry and the relationship between manufacturers and dealers for several years. Title 28 regulates the automobile manufacturers' business transactions in this State, preventing the manufacturers from competing with their dealer franchisees. *See* A.R.S. § 28–4333(A) and § 28–4334(A). Such franchise laws keep the disparity of power between manufacturers and dealers in check. Similar regulations exist in nearly every State. *See generally, New Motor Vehicle Board of California v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) (recognizing State interest in regulating dealer-manufacturer relationship); *Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.*, 376 Mass. 313, 381 N.E.2d 908 (1978) (explaining rationale behind State regulation of dealer-manufacturer relationship).

The statute at issue, A.R.S. § 28–4460, is an addition to the existing regulatory scheme of the manufacturer-dealer relationship. It is designed to further protect independent dealerships from manufacturers who have a significant position of power as the provider of all dealer product and the overseer of all financial information. The Arizona Legislature has determined that consumers are best served by independent licensed automobile dealers.

Historically, aside from the direct sale of vehicles, manufacturers have been permitted to conduct other lines of business in the automobile industry, such as providing financing, aftermarket accessories, extended warranties and emergency road service.

---

1. The declarants include DaimlerChrysler Corp., Ford Motor Company, Lincoln Town Car and Lincoln Continental, General Motors Corporation, GMAC Insurance, and Toyota Motor Sales USA, Inc.

Here, the contested statute curtails those ancillary activities. Generally, the instant statute forbids manufacturers from owning or operating a dealership in this State, or from directly selling vehicles, parts, services, financing, or accessories directly to customers in this State. It also precludes manufacturers from dictating prices or otherwise discriminating against the dealerships.

Plaintiffs allege various provisions of A.R.S. § 28–4460 violate the United States Constitution and the Arizona constitution; specifically, the Commerce, Due Process, First Amendment Free Speech, Equal Protection, Fifth Amendment Takings and Supremacy clauses. Plaintiffs contend that the statute "as a whole" as well as each section standing alone violates the aforementioned constitutional provisions.

Because the constitutional claims allegedly impact the parties in a variety of different ways and have varying degrees of strength on the merits, the Court will address each provision of the statute separately with regard to the applicable standard for injunctive relief. Those claims raising the most significant constitutional questions will be dealt with first. All other constitutional claims not discussed at length in this order need not be reviewed.

## DISCUSSION

### I. Preliminary Issues

#### A. Article III

■ Defendants Napolitano and Peters, in their Opposition to Motion for Preliminary Injunction, briefly raise an Article III "case or controversy" challenge to the manufacturers' complaint. Under Article III of the Constitution, a federal court lacks jurisdiction unless the plaintiffs present an actual "case or controversy." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). To satisfy this requirement, plaintiffs must have, *inter alia*, standing. *See American–Arab*

*Anti–Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 506 (9th Cir.1991).

A violation of § 28–4460 by a manufacturer carries with it the threat of criminal sanctions. *See* A.R.S. § 28–4591. In order to challenge the constitutionality of § 28–4460, it is not necessary that the manufacturers first expose themselves to "actual arrest or prosecution" in order to establish ᐟ standing. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), *quoting Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Rather, to establish "a dispute susceptible to resolution by a federal court," plaintiffs must allege that they have been "threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Babbitt*, 442 U.S. at 299, 99 S.Ct. at 2309, *quoting Younger v. Harris*, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *see also Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141 (9th Cir.2000) (explaining standing requirements for organizations on behalf of their members).

In the instant matter, plaintiffs have sufficiently alleged the manufacturers are engaging in conduct which may be prohibited under § 28–4460 to satisfy the Article III "case or controversy" requirement.

#### B. Presumption that Statute is Constitutional

The Court must interpret a state statute in a way that renders it constitutional with any uncertainties being resolved in favor of constitutionality. *In re Aircrash in Bali*, 684 F.2d 1301 (9th Cir.1982), *Anderson v. Mullaney*, 191 F.2d 123, 135 (9th Cir.1951), *KZPZ Broadcasting, Inc. v. Black Canyon City Concerned Citizens*, 13 P.3d 772 (Ariz.App.2000); *State v. Gilfillan*, 196 Ariz. 396, 998 P.2d 1069 (2000). The issue of the statute's constitutionality

is before the Court for the purpose of determining whether injunctive relief is warranted. The party alleging a statute's unconstitutionality bears the burden of persuasion. *Jackson v. Tangreen,* 18 P.3d 100 (2000).

### C. Severability

To avoid future confusion over interpretation of this law, the Court finds a severability clause present in this statute. What is currently codified in the Arizona Revised Statutes as § 28–4460 is in fact "Section 5" of H.B. 2101 as signed by the Governor. H.B. 2101 contained several pieces of legislation in addition to "Section 5" or § 28–4460. One of those components was "Section 6," which is a severability clause applicable to every other section of H.B. 2101, including "Section 5" or § 28–4460.

Because H.B. 2101 contains no provision for specifically codifying Section 6 in the Arizona Revised Statutes, however, the severability clause does not appear anywhere in the statute and can only be found by examining the original session law. For the Court's purposes, it suffices that it was signed by the Governor.

Due to the existence of a severability clause, plaintiffs must meet their burden for injunctive relief on each provision and the Court must analyze each provision of this statute separately. Plaintiffs are not entitled to an order enjoining the State from enforcing the statute in its entirety merely by demonstrating a need for such relief based on a single application of one subsection.

### II. Motion for Preliminary Injunction

To obtain a preliminary injunction in the Ninth Circuit, the moving parties must show:

> "...either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious

questions are raised and the balance of hardships tips sharply in its favor. These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases."

*Big Country Foods, Inc. v. Board of Educ.,* 868 F.2d 1085, 1088 (9th Cir.1989).

### A. § 28–4460(B)(3): Influencing and Controlling Provision and the First Amendment

The essence of plaintiffs' First Amendment challenge is that the operative effect of subsections (B)(3) and (C)(1) taken together prevents vehicle manufacturers from publishing pricing information about vehicles and other products on their Internet websites. Subsection (B)(3) of the statute states in relevant part that vehicle manufacturers are prohibited from:

> controlling any aspect of the final amount charged, the final sales price or the final lease price for any of the vehicles or products, trade-ins, services or financing offered, offered for sale or offered for lease to retail consumers in a dealer's area of responsibility without the written consent of the dealer.

A.R.S. § 28–4460(B)(3). The statute permits certain enumerated exceptions to the manufacturers' ability to "control" the retail prices of vehicles, including the establishment "from time to time" of "reasonable sales, lease or financing promotions of reasonable and limited duration." § 28–4460(B)(3)(b).

In subsection (C)(1), the statute defines "controlling" as used in subsection (B)(3) to mean "dictating, limiting, establishing, setting or influencing through any means." § 28–4460(C)(1). The statute thus forbids a manufacturer from "influencing by any means" the final retail sales or lease price that a dealer charges to consumers for

"vehicles or products, trade-ins, services or financing" within the dealer's area of responsibility. Plaintiffs' challenge is to the provision's language referring to "influencing by any means" as it allegedly applies to the communication of pricing information to consumers, which in turn has an impact on final retail prices charged by dealers.

When considering a request for preliminary injunctive relief in the area of free speech, "[the] loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Gentala v. City of Tucson,* 213 F.3d 1055, 1061 (9th Cir.2000); *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1148 (9th Cir.1998), *quoting Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

The presumption of irreparable injury in a motion for preliminary injunction undoubtedly extends to expression of purely commercial information, which is entitled to vigorous First Amendment protection. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), *44 Liquormart v. Rhode Island,* 517 U.S. 484, 497, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), *Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173, 194, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999); *see also North Olmsted Chamber of Commerce v. City of North Olmsted,* 86 F.Supp.2d 755, 770, n. 10 (N.D.Ohio 2000) (noting increasingly heightened scrutiny of regulations of commercial speech).

Nonetheless, before the "extraordinary writ" of injunctive relief can be imposed upon an act of a State legislature, *Gunn v. University Committee to End War,* 399 U.S. 383, 389, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970), the movant must meet its burden of persuasion with respect to the fundamental factual premises of the alleged constitutional violation.

■ In this case, the Court notes as an initial matter that plaintiffs have not presented a facial First Amendment challenge to the statute for purposes of preliminary injunctive relief. For a statute to be facially invalid, it must reach a "substantial amount of constitutionally protected conduct" and be "invalid *in toto*—and therefore incapable of any valid application." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). In their motion, plaintiffs do not allege and present no evidence showing that the operative effect of subsections (B)(3) and (C)(1) reaches a "substantial amount" of protected conduct, or that it is "incapable of any valid application." The Court thus construes plaintiffs' First Amendment complaint as an "as-applied" challenge for purposes of this motion.

In an as-applied First Amendment challenge, plaintiffs must bear the burden of sufficiently identifying the speech they allege is being infringed and how the challenged application of a statute will affect that speech. While the Court is keenly aware of the complexity of the issues underlying this case and the corresponding difficulty of organizing the facts giving rise to this complaint, in order to succeed on a motion for preliminary injunction plaintiffs must, at a bare minimum, specify with reasonable precision the speech they wish the Court to enjoin the State from burdening.

In particular, the Court finds little guidance from plaintiffs' motion on the actual substantive content of the manufacturers' speech on their websites; what information the speech conveys; whether the information is derived from confidential financial records belonging to the dealers; and how Arizona consumers receive and eventually utilize the information. Without presenting sufficient evidence to estab-

lish a factual foundation for plaintiffs' challenge, the Court is unable to delve into the serious free speech issues before it at this initial stage of the proceedings.

### B. § 28–4460(B)(4): The Low–Price Provision and the Commerce Clause

Subsection (B)(4) of the statute provides in relevant part that no vehicle manufacturer shall:

refus[e] to unconditionally offer and provide to its same line-make dealers all models or series manufactured and publicly advertised for that line-make at prices that are [no] greater than any other dealer in the United States would pay for the same model vehicle that is similarly equipped.

A.R.S. § 28–4460(B)(4). Significant exceptions to this requirement are permitted for, *inter alia,* "reasonable sales, lease or financing promotions of reasonable and limited duration." § 28–4460(B)(4)(b). The provision thus prevents a manufacturer from lowering the price it offers for its vehicles to dealers outside Arizona below the price it is offering to Arizona dealers, subject to the limited exceptions in subsection (B)(4)(b). Conversely, a manufacturer may not raise its price for a vehicle in Arizona to anything above the highest price it is offering in any other part of the United States, even if market conditions favor such a price increase.

### 1. Probable Success on the Merits

■ The United States Constitution states "Congress shall have Power [to] regulate Commerce [among] the several States." U.S. Const. Art. I, § 8, cl. 3. The Supreme Court has interpreted this provision to prohibit State legislation that burdens interstate commerce even in the absence of express Congressional action, thus leading to its modern identity as the "dormant Commerce Clause." *See C & A Carbone v. Town of Clarkstown,* 511 U.S.

383, 401, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (O'Connor, J., concurring) ("The scope of the dormant Commerce Clause is a judicial creation").

For "dormant" commerce clause purposes, State economic regulations generally fall into one of two categories: (1) regulation that "directly regulates or discriminates against interstate commerce," which has a strong presumption of unconstitutionality; or (2) regulation that has only "indirect effects on interstate commerce," which is valid only where the State's interest is legitimate and the burden on interstate commerce does not clearly exceed the local benefits of the regulation. *Brown–Forman Distillers v. New York Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986).

■ In *Healy v. The Beer Institute,* 491 U.S. 324, 335–37, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989), the Supreme Court used a three-part test to examine whether an economic regulation, in that case a direct regulation of interstate commerce, violated the Commerce Clause by asking (1) whether the statute controls commerce that takes place "wholly outside of the State's borders" by establishing a *de facto* "scale of prices for use in other States," even if the commerce also had effects within the State; (2) whether the practical effect of the statute is to directly control conduct beyond the boundaries of the State; and (3) what effects could conceivably arise if "not one, but many [States] or every State adopted similar legislation" to the challenged statute.

The Court separately held in Part IV of its opinion that even if a statute satisfies the three-part test, if the statute's language facially discriminates against entities engaging in interstate commerce in favor of those which engage purely in intrastate activities, the statute is invalid on

its face. *Id.* at 340–41, 109 S.Ct. 2491, citing *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988); *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982).

Under either standard, plaintiffs face two immediate and related problems in their challenge to this provision: (1) the record is incomplete and the Court is unable to evaluate from the evidence presented thus far the precise nature of the manufacturers' pricing programs; and (2) due to the absence of a comprehensive factual record on this issue, the Court is unable to determine the tangible "practical effect" of the statute on commerce outside Arizona.

The Court concludes that plaintiffs have not shown a "probability of success" on the merits of their Commerce Clause claim with respect to *Healy,* 491 U.S. at 335–37, 109 S.Ct. 2491. Plaintiffs briefly raise the potentially valid argument that subsection (B)(4) may have a facially discriminatory effect on interstate commerce in favor of intrastate commerce. *Id.* at 340–41, 109 S.Ct. 2491. However, the Court finds plaintiffs' briefs insufficient to support a finding of "probable success on the merits" on these issues at this time.

#### 2. Irreparable Harm

■ Plaintiffs do not point to any alleged harm based specifically on subsection (B)(4), focusing instead on their other constitutional challenges in the motion. The Court finds no evidence showing that if subsection (B)(4) were permitted to go into effect, the manufacturers would have to change their current national, regional or local pricing programs in any manner. The existence of various exceptions to the "low price" requirement further reinforces the absence of irreparable harm. The explicit allowance in subsection (B)(4)(b) for "reasonable sales, lease or financing promotions of reasonable and limited dura-

tion" appears to preclude plaintiffs from making a successful argument, for purposes of this motion, that their pricing programs will be affected.

Plaintiffs argue that violations of constitutional rights can by themselves constitute irreparable injury. *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir.1993), *Gentala v. City of Tucson,* 213 F.3d 1055, 1061 (9th Cir.2000). However, each case cited by plaintiffs supporting this principle was based on a violation of an individual constitutional right, and none of the cases presumed irreparable harm based on an alleged violation of the "dormant" Commerce Clause. Nor do plaintiffs make a persuasive argument in favor of placing violations of the Commerce Clause in the same category as the set of fundamental constitutional rights ordinarily afforded such protection, such as the Free Speech, Establishment, and Due Process Clauses. *See, e.g., Gentala,* 213 F.3d at 1061 (free speech), *Doe v. Duncanville Indep. Sch. Dist.,* 994 F.2d 160, 166 (5th Cir.1993) (establishment clause), *Able v. United States,* 847 F.Supp. 1038, 1043 (E.D.N.Y.1994) (due process and free speech).

#### C. § 28–4460(B)(2): Aftermarket Services Provision

■ Subsection (B)(2) prohibits manufacturers from "selling, leasing or providing, or offering to sell, lease or provide products, services or financing to any retail consumer or lead," with certain enumerated exceptions. Plaintiffs assert the statute's ban on direct sales of financing, services and products by the manufacturers violates the Commerce Clause by "unduly burdening the manufacturers' and their affiliates' ability to conduct commercial activities on a national and global basis, via the Internet and through more traditional means." Plaintiffs also assert

this provision offends the Equal Protection Clause because it treats the manufacturers differently than others providing the same services.

### 1. Commerce Clause

Defendants deny plaintiffs have shown any burden on interstate commerce, suggesting the proposed ban on aftermarket services is analogous to the existing ban on direct sales of vehicles. Defendants cite *Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) to support that proposition. In *Exxon,* the U.S. Supreme Court upheld a Maryland law which prohibited refiners of petroleum from owning retail gas stations. The Court ordered that Exxon divest itself of 36 retail gas stations, and held that a shift in sales from out of state refiners to independent dealers did not impose an impermissible burden on interstate commerce.

The instant statute prohibits manufacturers from selling services in competition with dealers. Plaintiffs do not contest, and understandably so in light of *Exxon,* that manufacturers cannot sell vehicles directly to consumers. Construing *Exxon* with regard to the realities of the automobile industry, this Court fails to find a distinction between the sale of vehicles and the sale of aftermarket parts and services relating to those vehicles. In both instances, the manufacturer is competing with the dealer.

The *Exxon* holding was predicated on the disparity of power between the refiner and the retail owners of gas stations. The Supreme Court concluded direct ownership by the refiner was legitimately prohibited and not unduly burdensome on interstate commerce. Here, plaintiffs have not shown a distinction exists between the favorable position the manufacturer wields over the dealer, and the disparate power of the refiner in *Exxon* to distinguish *Exxon* from these facts. This Court finds *Exxon*

instructive here. Plaintiffs have failed to show a likelihood of success on the claim that this provision of the statute impermissibly impedes upon interstate commerce.

### 2. Equal Protection

■ Plaintiffs additionally argue *Exxon* is distinguishable from these facts since the refiner in *Exxon* was the sole source for that product. In contrast, the manufacturers here are not the sole source of the products and services prohibited by this provision. For instance, the provision bans direct financing by the manufacturer, but does not prohibit a bank or credit union from financing a vehicle purchased through a dealer. Plaintiffs believe they are being singled out and treated dissimilarly in violation of the Equal Protection Clause. They miss one important detail. There exists an underlying agreement, the automobile franchise regulations, which controls the manufacturer-dealer relationship and protects dealers from competitive business practices by the manufacturers. The manufacturers are not similarly situated to a bank, a credit union, an extended warranty company, or a used parts facility. None of those entities are bound by an agreement to not compete with the dealers, nor are those entities in a disparately powerful position over the dealers.

### 3. Harm

■ Because the Court finds the aftermarket sales ban does not present a constitutional violation, plaintiffs' burden of harm is increased. *Big Country Foods,* 868 F.2d at 1088 ("the degree of irreparable harm increases as the probability of success of the merit decreases"). Plaintiffs allege that compliance with the aftermarket provision will force them to terminate or completely reorganize their operations to exclude existing means for consumers to obtain aftermarket services.

That will require significant alterations to their internationally accessed websites, simply to accommodate this state's ban. Additionally, they purport consumers would experience a disruption in service. For instance, those consumers enjoying extended service warranties or roadside assistance would be either temporarily or permanently deprived that service if the manufacturer is required to discontinue providing the service.

Defendants deny the manufacturers will be forced to cease operations. They point out that roadside assistance, extended warranties and provision of financing information will still be available through the manufacturer. The statute only requires that the service be initially sold through the dealer, "Once a manufacturer's roadside assistance program has been sold by the dealer, the statute does not prohibit the manufacturer from honoring its contract and following through on its commitment to the consumer."

When the Court weighs the respective harms surrounding this provision, it cannot conclude the balance decisively tips in plaintiffs' favor. On one hand, there are privately-owned dealerships who have invested a great deal of money in a brick and mortar establishment and are completely at the mercy of the manufacturer for product. On the other hand, the manufacturers are being prohibited from engaging in sales and services to increase business and profit. Weighing in defendants' favor is that the manufacturers' harm is speculative and premature to assess. Some of plaintiffs' claims deal with products and services that are not presently offered by the manufacturers. In other instances, the manufacturers are not facing a complete shut-down of operations, but instead are required to allow the dealerships to consummate the initial transaction. The dealers describe it as "structuring the retail market" rather than prohibiting the activities altogether. That appears to have been the legislative purpose of this statute, to further structure and regulate the automobile industry, and the Court must presume that is constitutional unless plaintiff demonstrates otherwise. *Gilfillan*, 196 Ariz. 396, 998 P.2d 1069.

## D. § 28–4460(B)(5): "Leads" Forwarding Provision

Subsection (B)(5) provides that when a lead of a prospective retail customer is discovered, the manufacturer must forward that lead to a dealer within the same geographic area as the prospective customer. Plaintiffs claim this provision violates the Commerce Clause and the Fifth Amendment Takings Clause.

### 1. Takings Clause

■ With respect to the Takings Clause challenge, plaintiffs assert the forwarding requirement deprives them of "property" without just compensation. Citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), plaintiffs argue leads are intellectual "property" for purposes of the Takings Clause. The test for determining whether commercial data such as leads constitute property requires examination of "existing rules or understandings that stem from an independent source such as state law." *Id.* at 1001, 104 S.Ct. 2862. Plaintiffs do not cite a single source of law to support the claim that leads constitute property and thereby fail to satisfy their burden of persuasion as to the Takings Clause.

### 2. Commerce Clause

■ While courts must be alert to "the evils of economic isolation and protectionism," they must also recognize that "incidental burdens on interstate commerce may be unavoidable when a State legis-

**1176**

lates to safeguard the health and safety of its people." *City of Philadelphia v. New Jersey,* 437 U.S. 617, 623, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). While laws that "overtly block the flow of interstate commerce at a State's borders" are presumptively invalid, laws based on legitimate legislative objectives where there is "no patent discrimination" against interstate trade are viewed with a much more flexible approach. *Id.; Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The crucial inquiry is whether the law is essentially a "protectionist measure" or can fairly be viewed as directed to "legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia,* 437 U.S. at 623, 98 S.Ct. 2531.

Plaintiffs cite a single case, *Brown–Forman Distillers v. New York State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), in support of their theory that the statute's lead-forwarding requirement constitutes discrimination against interstate commerce. On this authority alone, plaintiffs have failed to satisfy their burden of showing that the provision "patently discriminates" against dealers in other States, or that even if discrimination exists it is not merely "incidental" to Arizona's legitimate purpose of preventing manufacturers from undermining the efforts of dealers.

■ Without having demonstrated a probability of success on the merits, the burden on plaintiffs to demonstrate irreparable harm increases. *Big Country Foods,* 868 F.2d at 1088 ("the degree of irreparable harm increases as the probability of success on the merits decreases"). While plaintiffs assert that the requirement to forward leads to dealers will constitute irreparable harm for a number of reasons, they have not shown how it will change existing practices with respect to the flow of commercial information between dealers

and manufacturers. Without a more complete factual record, the Court finds plaintiffs have not satisfied their heightened burden for irreparable harm as set forth in *Big Country Foods.*

**E. § 28–4460(A): Anti–Competition Provision**

■ Subsection (A), seemingly an umbrella provision encompassing subsection (B) of this statute, broadly prohibits car manufacturers from "directly or indirectly compet[ing]" with car dealerships. The provision purports to define what "competition" means by stating, "[competition] includes any one of the following," with reference to subsection (B). Plaintiffs contend that definition is unconstitutionally vague since it implies that "competition" may cover more than what is enumerated in subsection (B). Accordingly, plaintiffs allege the prohibition on manufacturers "indirectly competing" with dealerships is void for vagueness pursuant to the Due Process Clause.

**1. Vagueness**

Plaintiffs raise a legitimate concern regarding defendants' interpretations of the applicability of the statute, alleging defendants construe some provisions beyond the plain language. Because plaintiffs cannot determine what conduct is permitted or prohibited, they claim subsection (A) is void for vagueness.

During oral arguments and throughout the papers, defendants made representations as to the boundaries or applicability of several aspects of the statute. Defendants' proffered representations make some of the provisions less ambiguous and more palpable for plaintiffs. The Court understands plaintiffs' hesitancy to rely on those interpretations, especially in light of the criminal sanctions should defendants fail to maintain their position. However,

the Court is obligated to look to every reasonable construction possible in an effort to save the statute as constitutional. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). It is plaintiffs' burden to demonstrate the invalidity of the provision. Otherwise, the Court must endeavor to interpret the law in such a way to render it constitutional. *State v. Alawy,* 198 Ariz. 363, 9 P.3d 1102 (2000). Based on that authority and defendants' representations, the Court cannot conclude that harm is imminent.

The Court obviously relies on defendants' interpretations in finding harm is not imminent, and admits that the scenario may be different if defendants had not offered clarity as to the coverage and applicability of the statute. At this point, those interpretations, combined with plaintiffs' burden of proof on injunctive relief, render the provisions reasonable and constitutional. If at some time plaintiffs are in a position where they will "roll the dice" and risk criminal penalty for taking action understood to be permissible, then the Court can revisit the matter. At that time, requisite harm may be present, but for now the threat that harm *may* come is too speculative to warrant injunctive relief.

### CONCLUSION

An injunctive order is an "extraordinary writ" which federal courts must exercise restraint in issuing. *Gunn,* 399 U.S. at 389, 90 S.Ct. 2013.

Plaintiffs have failed to make the requisite showing to support injunctive relief. Notwithstanding any reservations this Court may have regarding the legislative wisdom of this statute or the clarity of the language contained therein, the Court is not in the position to reject any provision short of blatant constitutional violation. While plaintiffs have presented arguments that may hold merit upon the development of a more comprehensive factual record, they have not met their burden at this stage of the proceedings, due, in large part, to their failure in proving the balance of hardships tips decidedly in their favor or that any irreparable harm would result from denial of an injunction. Plaintiffs admit that the measure of their injury is not easily quantifiable, but a showing of imminent threat of injury is required nonetheless. *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 423 (9th Cir.1991).

Contemporaneous with this Order, the Court will enter its Scheduling Order to guide the parties through discovery. Plaintiffs may be able to supplement the record with clearer evidence to support the merits of their claims or offer more concrete proof of irreparable harm or imbalance during that process.

IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (Doc. # 2) is DENIED.